[No. A129295. First Dist., Div. One. Mar. 6, 2013.]

GEORGE J. BORIKAS, as Trustee, etc., et al., Plaintiffs and Appellants, v. ALAMEDA UNIFIED SCHOOL DISTRICT, Defendant and Respondent.

138

## Counsel

Randick O'Dea & Tooliatos, Leslie A. Baxter; Brillant Law Firm, David J. Brillant, Brian Carideo; and Umung D. Varma for Plaintiffs and Appellants.

Chapman, Popik & White, Susan M. Popik, David Nied; Dannis Woliver Kelley, Sue Ann Salmon Evans, Janet L. Mueller and William B. Tunick for Defendant and Respondent.

Lozano Smith, Jeffrey L. Kuhn and Sloan R. Simmons for California School Boards Association as Amicus Curiae on behalf of Defendant and Respondent.

## Opinion

**BANKE, J.—**

### I. Introduction

This case involves the validity of a parcel tax approved by Alameda Unified School District (District) voters in June 2008 as Measure H. The issue before us is whether the tax violates Government Code section 50079, which authorizes school districts to levy "qualified special taxes." (Gov. Code, § 50079, subd. (a).)[1] Such taxes are statutorily defined as "taxes that apply uniformly to all taxpayers or all real property within the school district, except that 'qualified special taxes' may include taxes that provide for an exemption from those taxes for taxpayers 65 years of age or older or for persons receiving Supplemental Security Income for a disability, regardless of age." (§ 50079, subd. (b)(1).) Measure H provides exemptions for some senior and disabled taxpayers. It also imposes different tax rates on residential and commercial/industrial properties, as well as different rates on different sized commercial/industrial properties.

Plaintiffs and appellants contend Measure H's property classifications, differing tax rates and conditional exemptions violate section 50079's definitional language that special taxes apply "uniformly" to all taxpayers or all real property within the district. The District views this statutory language as reflecting long-established equal protection principles which allow a governmental entity to create reasonable tax classifications, so long as all taxpayers within a classification are treated the same.

As we will discuss, section 50079 is one of a number of statutes enacted in the wake of Proposition 62, a statewide initiative approved by California voters in 1986 and aimed at closing perceived loopholes in Proposition 13. In addition to defining the terms "special taxes" and "general taxes" and specifying the voter approval requirements for each, Proposition 62 specified that neither Proposition 13 nor general enabling legislation passed in response to that initiative invested local governmental entities with the power to levy taxes. The Legislature responded with a host of statutory provisions expressly delegating taxing authority to a panoply of local districts, including school districts. Many of these statutes contain the same language appearing in section 50079 and at issue here—that special taxes are "taxes that apply uniformly to all taxpayers or all real property within the" particular district.

After examining the language and legislative history of section 50079, and that of the correlative enabling statutes, we conclude the Legislature did not

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

include this definitional language in order to acknowledge established equal protection principles. Rather, the language at issue was intended to be a constraint on the extent of the taxing authority delegated to the local governmental entities. We therefore conclude Measure H's property classifications and differential tax burdens exceed the District's taxing authority under section 50079 and the judgment entered in favor of the District must, in part, be reversed. We also conclude these provisions can be severed from the measure and that Measure H's exemptions for senior and disabled taxpayers are permissible under the statute.

We are aware that we are being called on to interpret statutory language enacted in a different economic era and in the wake of two of the most far-reaching tax constraining measures ever passed by the state electorate (Propositions 13 and 62), that the state has since faced crippling economic conditions, and that school districts and other local governmental entities are more dependent than ever on the revenues from special taxes. The courts, however, cannot recalibrate the taxing power statutorily delegated to local entities; any adjustment in that regard must be made by the state Legislature.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The essential facts are limited and undisputed. On March 4, 2008, the District's Board of Education adopted resolution No. 08-0010. This resolution authorized the Alameda County Superintendent of Schools to call a districtwide election on June 3, 2008, on a measure to impose a qualified special tax on taxable residential, commercial and industrial property for a four-year period, commencing July 1, 2008, and ending June 30, 2012. District voters approved the measure (Measure H) by just over a two-thirds vote.[2]

Measure H taxes residential and commercial/industrial properties differently. Nonexempt residential parcels are taxed at $120 per year. Commercial and industrial parcels less than 2,000 square feet are also taxed at $120 per year; those greater than 2,000 square feet are taxed at $0.15 per square foot to a maximum of $9,500 per year.

---

[2] The ballot asked for a "yes" or "no" vote in the following language: "Measure H: To offset severe state budget cuts to Alameda schools, minimize school closures, and protect the quality of education, student safety, class sizes, excellent teachers and staff and to restore prioritized cuts to music, athletics, and advanced placement courses, shall Alameda Unified School District levy a temporary 4-year emergency tax of $120 per residential parcel and 15 cents per square foot for commercial/industrial parcels (see voter pamphlet), with exemptions for seniors, and all funds staying local?"

Measure H includes two exemptions. The first is for owners of single-family residential units who live on the property as their principle residence and are 65 years of age or older during the assessment year. The second is for owners of single-family residential units who live on the property and receive Supplemental Security Income for a disability, regardless of age. If eligible, property owners must apply for the exemptions.

The measure also has a severability clause providing: "If any section, subsection, sentence, phrase, part or clause of this measure is, for any reason, held to be unconstitutional, illegal or invalid, such decision shall not affect or impair the validity of the remaining portions of this measure. It is hereby declared that the intention of the Board of Education of the District and the electorate [is] that this measure would have been adopted had such unconstitutional, illegal or invalid section, subsection, sentence, phrase, part or clause thereof not been included."

On August 21, 2008, George J. Borikas, trustee of the George J. Borikas 1999 Revocable Trust, filed suit seeking to have the special tax authorized by Measure H declared invalid and not a lien on properties he owns. Specifically, Borikas alleged Measure H exceeded the taxing authority given to school districts under section 50079 because the tax does not apply "uniformly" to all parcels in the district. On November 10, 2008, Borikas filed a first amended complaint, adding as plaintiffs Edward Hirshberg, trustee of the Hirshberg Trust, Santa Clara Investors II, a general partnership, and Nelco, Inc. The substance of the complaint remained the same.[3]

After numerous pretrial proceedings, including demurrers, motions to strike, and motions for summary judgment, the case was consolidated with another action challenging the parcel tax. The case was then tried by the court on a stipulated written record consisting of previously submitted separate statements of undisputed facts, responding statements and supporting documentation, exhibits and requests for judicial notice.[4] The trial court ruled in favor of the District.

---

[3] The complaint, filed before the first payment of the special tax came due, also sought "costs of suit" and "other and further relief as the court may deem proper," but did not pray for a refund of taxes. Plaintiffs' first amended complaint similarly prayed for costs of suit and other proper relief, but not a refund. Plaintiffs' summary judgment motion, however, did request a refund, stating: "Plaintiffs have prayed for further relief as the court may deem proper. If the court determines that Measure H is void, it is just and proper for the court to order the District to disgorge all payments it has received, for Measure H taxes it has assessed . . . ." Plaintiffs reiterated this request in their trial brief.

[4] In connection with the various pretrial motions, both sides requested, and the trial court granted, judicial notice of the complete legislative history of section 50079. Pursuant to the parties' stipulation on evidence, the court also had this history before it during trial.

Looking to case law involving tax challenges on equal protection grounds, the court concluded section 50079's definitional language is satisfied if tax classifications bear a rational relationship to a legitimate governmental objective and all taxpayers within the same classification bear the same tax. The court acknowledged the legislative history of section 50079 includes comments to the contrary, but disregarded them as having been made by nonlegislators and viewed the legislative history as primarily concerned with allowing an exemption for seniors. The court similarly rejected the plaintiffs' challenge to the restriction of the senior and disabled exemptions to residential property owners.[5] Following entry of judgment for the District, plaintiffs timely appealed.[6]

## III. Discussion

### A. Backdrop: Propositions 13 and 62

■ In 1978, California voters approved Proposition 13, which added article XIII A to the state Constitution and dramatically changed state and local tax structures. (*Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178, 1182 [132 Cal.Rptr.2d 1].) "The general purpose of Proposition 13 . . . was to afford tax relief to California real property owners by imposing (1) limitations upon the tax rate applicable to real property, (2) restrictions on the valuation and assessment of real property, (3) stricter voting requirements for any change by the Legislature in tax rates or methods of computation and (4) elimination of the right of the state and local entities (i.e., cities, counties, and special districts) to impose ad valorum taxes on real property or transaction or sales taxes on the sale of real property." (*California Bldg. Industry Assn. v. Governing Bd.* (1988) 206 Cal.App.3d 212, 219 [253 Cal.Rptr. 497] (*CBIA*); see *Weisblat v. City of San Diego* (2009) 176 Cal.App.4th 1022, 1034 [98 Cal.Rptr.3d 366] (*Weisblat*).) To prevent local taxing entities from circumventing these tax limitations, Proposition 13 further specified any new or increased special tax proposed by a county, city or special district must be approved by a two-thirds vote of the local electorate. (Cal. Const., art. XIII A, § 4; *Rider v. County of San Diego* (1991) 1 Cal.4th 1, 7 [2 Cal.Rptr.2d 490, 820 P.2d 1000] (*Rider*) ["section 4's restriction on local taxes is part of an 'interlocking "package" deemed necessary by the initiative's framers to assure effective real property tax relief' "], quoting *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr.239, 583 P.2d 1281].)

---

[5] In addition, the court rejected the plaintiffs' assertion that the stated uses of the parcel tax are so broad as to render the tax a general, rather than a special, tax, a claim they have not pursued on appeal.

[6] Plaintiffs in the case consolidated for trial did not appeal.

Proposition 13 also prohibited any county, city or special district from imposing any new special tax unless expressly authorized to do so by the state Legislature. (*CBIA, supra*, 206 Cal.App.3d at pp. 222–223.) The Legislature promptly responded by enacting general enabling legislation. (§ 50075 et seq.;[7] *Weisblat, supra*, 176 Cal.App.4th at p. 1035; *CBIA, supra*, 206 Cal.App.3d at p. 223.)

Numerous legal challenges to Proposition 13 and to newly imposed taxes followed. In several decisions the Supreme Court departed from the liberal approach it initially had taken in construing the proposition, and read its language narrowly. (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935] (*Farrell*)[8] [strictly construing Cal. Const., art. XIII A, § 4 and holding a special tax for purposes of Prop. 13 is a tax that both has a specific purpose *and* the revenues of which are kept separate from and not placed in the taxing authority's general fund]; *Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941] (*Richmond*)[9] [departing from liberal approach it had previously taken and adopting definition of special district for purposes of Prop. 13 narrower than is otherwise provided by statute]; see *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 233, fn. 7 [45 Cal.Rptr.2d 207, 902 P.2d 225] (*Guardino*).)

In response to these decisions, the proponents of Proposition 13 successfully placed another proposition on the statewide ballot in 1986, Proposition 62. (See *Guardino, supra*, 11 Cal.4th at pp. 235, 237 [noting ballot arguments targeting *Farrell* decision and observing "evident intent of the drafters of Proposition 62 [was] to close by legislation what they perceived were court-made 'loopholes' in Proposition 13"]; *Rider, supra*, 1 Cal.4th at p. 11 [that after *Richmond* numerous " 'special purpose' " districts were created and authorized to impose taxes on a simple majority vote "strongly indicate[d] a large 'hole' ha[d] indeed been created in Proposition 13"].)

Proposition 62 was a statutory, rather than a constitutional, initiative that added a new article to the Government Code. (*CBIA, supra*, 206 Cal.App.3d at p. 223.) These statutory provisions specify there are two kinds of taxes, "general" and "special," and define "special taxes" as taxes "imposed for specific purposes," and require that all new local taxes imposed by

---

[7] Section 50075, for example, provides: "It is the intent of the Legislature to provide all cities, counties, and districts with the authority to impose special taxes, pursuant to the provisions of Article XIIIA of the California Constitution." (§ 50075.)

[8] Superseded by statute as stated in *Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, 1190 and footnote 7 [147 Cal.Rptr.3d 696].

[9] Abrogated in part as stated in *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 189–190 [29 Cal.Rptr.2d 128].

a "local government or district" be approved by the local electorate. (§§ 53721, 53722; see *Guardino, supra,* 11 Cal.4th at pp. 231–232.) A general tax must be authorized by a two-thirds vote of the legislative body of the taxing entity, but can be approved by only a majority of local voters. (§§ 53723, 53724, subd. (b).) A special tax may be authorized by a majority vote of the legislative body of the local taxing entity, but must be approved by a two-thirds majority of local voters. (§ 53722.) "The manifest purpose of Proposition 62 as a whole was to increase the control of the citizenry over local taxation by requiring voter approval of all new local taxes imposed by all local governmental entities . . . ." (*Guardino,* at p. 235.)[10]

Of particular significance to the issue before us, Proposition 62 also specified neither it, nor Proposition 13, "nor Article 3.5 of Division 1 of Title 5 of the Government Code (commencing with Section 50075) shall be construed to authorize any local government or district to impose any general or special tax which it is not otherwise authorized to impose." (§ 53727, subd. (a).) This provision called into question the taxing power of all local districts that looked to the general enabling legislation enacted after Proposition 13 and commencing with section 50075 as the source of their authority. (See *CBIA, supra,* 206 Cal.App.3d at pp. 224–225.)

A flurry of legislative activity ensued, resulting in a host of statutory provisions expressly authorizing local districts, including school districts, to levy special taxes in accordance with the dictates of Propositions 13 and 62. (See *CBIA, supra,* 206 Cal.App.3d at pp. 224–225; Ops. Cal. Legis. Counsel, No. 3061 (Apr. 17, 1987) Proposition 62: Voter Approval of Special Taxes Levied by School Districts re Assem. Bill No. 1440 (1987–1988 Reg. Sess.).)[11]

---

[10] In *Guardino,* the Supreme Court held Proposition 62's supermajority voting requirement for special taxes applies to any local district, rejecting the transportation authority's argument that the narrow definition of special district the court had adopted in *Richmond* for purposes of Proposition 13 should also apply to Proposition 62. (*Guardino, supra,* 11 Cal.4th at pp. 233–238.)

[11] This opinion letter is part of the legislative history of section 50079 and addressed two issues: (1) whether, in the wake of Proposition 62, school districts were authorized to levy special taxes, and (2) if school districts were not so authorized, whether the state Legislature could provide such authorization by statute and, if so, what vote was required to enact such legislation. (Ops. Cal. Legis. Counsel, No. 3061 (Apr. 17, 1987) Proposition 62: Voter Approval of Special Taxes Levied by School Districts re Assem. Bill No. 1440 (1987–1988 Reg. Sess.) p. 1.) The opinion letter concluded that after the passage of Proposition 62 school districts no longer had taxing authority, but the state legislature could provide such by statute enacted by majority vote of each house. (Ops. Cal. Legis. Counsel, No. 3061 (Apr. 17, 1987) Proposition 62: Voter Approval of Special Taxes Levied by School Districts re Assem. Bill No. 1440 (1987–1988 Reg. Sess.) pp. 10–11.) Opinion letters solicited by bill authors can, in appropriate cases, provide contextual understanding of the legislative process and, in such cases, may be subject to judicial notice. (See *Martinez v. Regents of University of California*

In the meantime, challenges were being mounted to ostensible special taxes imposed by some school districts after Proposition 13, but before the effective date of the special enabling legislation the Legislature passed for school districts, section 50079. In *CBIA*, the California Building Industry Association and the Building Industry Association of Southern California, Inc., challenged taxes being imposed by five different school districts on "persons" receiving new building permits and predicated on taxing authority supposedly provided directly by Proposition 13, section 4.[12] (*CBIA, supra,* 206 Cal.App.3d at pp. 220–221.) Even assuming the revenue measures were special taxes, the Court of Appeal held they were invalid for lack of any specific enabling legislation. (*Id.* at pp. 224–233 [Prop. 62 "confirms that section 4 of Article XIII A was not intended as a *grant* of a new taxing authority; moreover, [Prop. 62] specifically withdrew the enabling legislation contained in section 50075 et seq."].) Nor, said the court, could then newly enacted section 50079 "constitute a post-vote ratification of the exactions." (*CBIA,* at p. 225, fn. 16.) The court further held the taxes were a "transparent attempt" by the school districts to circumvent the dollar limitations on development fees imposed by other statutory provisions. (*Id.* at pp. 233–234.) Properly considered as fees, the court held the exactions exceeded the school districts' statutory authority and were invalid. (*Id.* at pp. 233–237, 239–240.)

With this background, we turn to the enabling statute in question, section 50079.[13]

---

(2010) 50 Cal.4th 1277, 1289 [117 Cal.Rptr.3d 359, 241 P.3d 855] [" 'though not binding' " they can, in appropriate circumstances, be " 'entitled to great weight when courts attempt to discern legislative intent' "]; *Walnut Valley Unified School Dist. v. Superior Court* (2011) 192 Cal.App.4th 234, 248, fn. 9 [121 Cal.Rptr.3d 383] ["The opinion of the Legislative Counsel, although not binding on the court, is entitled to consideration."].)

[12] Some seven years after the passage of Proposition 13, the Supreme Court observed that, because of the measure's supermajority requirement, special taxes had "rarely been imposed" and remained "novel." (*Candid Enterprises, Inc. v. Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 882 [218 Cal.Rptr. 303, 705 P.2d 876].)

[13] State voters approved a third tax limitation measure, Proposition 218, in 1996. Another outgrowth of Proposition 13 and an effort to close another perceived loophole created by proliferating "special assessments," Proposition 218 imposed significant constraints on the imposition of local "assessments, fees and charges." (Cal. Const., art. XIII D, §§ 1–3; see *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 835–837 [102 Cal.Rptr.2d 719, 14 P.3d 930].) It also placed in the Constitution some of the statutory language added to the Government Code by Proposition 62 (including that local taxes are either general or special, and any general tax must be approved by majority vote and special tax, by a two-thirds vote) and provided further definitional language as to when a tax is a general or a special tax. (Cal. Const., art. XIII C, §§ 1–2; see *Weisblat, supra,* 176 Cal.App.4th at pp. 1038–1040.)

B. *Government Code Section 50079*

1. *Statutory Language*

■ " 'The basic rules of statutory construction are well established. "When construing a statute, a court seeks to determine and give effect to the intent of the enacting legislative body." [Citation.] " 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.] If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." ' " (*Catlin v. Superior Court* (2011) 51 Cal.4th 300, 304 [120 Cal.Rptr.3d 135, 245 P.3d 860].) In that case, " ' " 'there is no need for construction and courts should not indulge in it.' " ' " (*People v. Palacios* (2007) 41 Cal.4th 720, 728 [62 Cal.Rptr.3d 145, 161 P.3d 519].) Thus, if the language is unambiguous, the plain meaning governs and it is unnecessary to resort to extrinsic sources to determine legislative intent. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 [129 Cal.Rptr.2d 811, 62 P.3d 54].)

Section 50079 is comprised of two subdivisions. The first authorizes school districts to impose "qualified special taxes" consistent with Proposition 13 and pursuant to procedures "established in Article 3.5 (commencing with Section 50075)." (§ 50079, subd. (a).) The second subdivision states: "As used in this section, 'qualified special taxes' means special taxes that apply uniformly to all taxpayers or all real property within the school district, except that 'qualified special taxes' may include taxes that provide for an exemption from those taxes for taxpayers 65 years of age or older or for persons receiving Supplemental Security Income for a disability, regardless of age." (§ 50079, subd. (b)(1).) " 'Qualified special taxes' do not include special taxes imposed on a particular class of property or taxpayers."[14] (§ 50079, subd. (b)(2).)

Plaintiffs contend the definitional language set forth in section 50079, subdivision (b)—and specifically the language that qualified special taxes

---

[14] Section 50079 states in its entirety: "(a) Subject to Section 4 of Article XIII A of the California Constitution, any school district may impose qualified special taxes within the district pursuant to the procedures established in Article 3.5 (commencing with Section 50075) and any other applicable procedures provided by law. [¶] (b)(1) As used in this section, 'qualified special taxes' means special taxes that apply uniformly to all taxpayers or all real property within the school district, except that 'qualified special taxes' may include taxes that provide for an exemption from those taxes for taxpayers 65 years of age or older or for persons receiving Supplemental Security Income for a disability, regardless of age. [¶] (2) 'Qualified special taxes' do not include special taxes imposed on a particular class of property or taxpayers." (§ 50079.)

"means special taxes that apply uniformly to all taxpayers or all real property within the school district"—means all taxpayers and all real property must be treated the same, and school districts are not empowered to treat different kinds of taxpayers, and different kinds of real property, differently. They point out the common meaning of the term "uniform" means "[o]f one form, character, or kind; having, maintaining, occurring in or under, the same form always; that is or remains the same in different places, at different times, or under varying circumstances; exhibiting no difference, diversity, or variation." (Oxford English Dict. (2d ed. 1989) p. 59; see Webster's 10th New Collegiate Dict. (1993) p. 1287; *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122 [29 Cal.Rptr.3d 262, 112 P.3d 647] ["When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word."].)

Plaintiffs also point out the statute provides two exceptions to the requirement that special taxes "apply uniformly to all taxpayers or all real property within the school district"—senior citizens and persons receiving permanent disability assistance can be exempted from the tax and thus treated differently than other taxpayers. That the statute expressly allows these two classifications, say plaintiffs, reinforces that classifications are not otherwise permissible and the definitional language, in and of itself, means all taxpayers and all real property must be treated the same. (Cf. *Fox etc. Corp. v. City of Bakersfield* (1950) 36 Cal.2d 136, 142–144 [222 P.2d 879] (*Fox Bakersfield Theatre*) [exemptions are a form of taxpayer classification—"[w]hether the tax statute may make a valid exemption [and thereby place the tax burden on other taxpayers] presents the same problem as that of classification; if the exempted persons or businesses may be included in a distinct class then the equal protection of the laws is not denied to those taxed"].) If the definitional language, alone, allowed rationally based classifications and differential tax treatment, there would be no need for the express exemptions for seniors and disabled persons, and these exemptions would be meaningless surplusage. (See *McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110 [105 Cal.Rptr.3d 404, 225 P.3d 538] (*McCarther*) [" 'A construction making some words surplusage is to be avoided.' "].)

Plaintiffs further point out section 50079 is one of a number of tax enabling statutes enacted in the wake of Proposition 62. Many include the same language—that a special tax must apply "uniformly to all taxpayers or real property within the district"—including section 50079.1, which immediately follows section 50079 and authorizes community college districts to impose special taxes. (§ 50079.1) Because section 50079.1 was enacted for the same reason and purpose as section 50079 (in response to Prop. 62 and to expressly provide taxing authority), and because it is part of the same statutory scheme as section 50079, plaintiffs maintain the same language in both statutes reflects the same legislative intent and should be given the same

meaning. (See *People v. Cornett* (2012) 53 Cal.4th 1261, 1269, fn. 6 [139 Cal.Rptr.3d 837, 274 P.3d 456] ["We recognize the rule of statutory construction that identical language appearing in separate statutory provisions should receive the same interpretation when the statutes cover the same or an analogous subject matter."]; *Guinn v. County of San Bernardino* (2010) 184 Cal.App.4th 941, 945 [109 Cal.Rptr.3d 667] ["If the language does not clearly express the Legislature's intent, we must interpret the statutory language in the context of any statutory scheme of which it is a part. We must also construe similar statutes, 'i.e., those in pari materia, to "achieve a uniform and consistent legislative purpose." [Citations.]' [Citation.]"].)

Thus, it is significant, say plaintiffs, that in section 50079.1 the Legislature did not authorize exemptions for seniors or disabled persons. Instead, the Legislature included *additional* language expressly authorizing community college districts to classify real property as "improved" and "unimproved" and to tax unimproved property at "a lower rate."[15] (§ 50079.1.) There was no need for this express authorization to classify real property and impose different tax rates if the "be applied uniformly to all taxpayers or real property" language, itself, allowed any rational classification and differential tax treatment. Plaintiffs therefore maintain section 50079.1's express authorization to community college districts to classify and differentially tax real property makes clear that the common language in question—that a special tax must "apply uniformly to all taxpayers or all real property within the district"—is language of limitation and does not, itself, authorize local districts to classify and differentially tax taxpayers or property.

The District, in turn, maintains "uniformity" in the realm of tax law has a well-established meaning that allows rational classifications and requires only that all taxpayers or property within a classification be treated the same. The District cites to a long line of cases involving constitutionally based equal protection challenges to a variety of tax laws. (E.g., *Fox Bakersfield Theatre, supra,* 36 Cal.2d at pp. 138–144 [upholding city licensing tax imposed on some entertainment businesses; "[n]o constitutional rights are violated if the burden of the license tax falls equally upon all members of the class, though other classes have lighter burdens or are wholly exempt, provided that the classification is reasonable . . ."]; *McCreery v. McColgan* (1941) 17 Cal.2d 555, 559–562 [110 P.2d 1051] [upholding state income tax statute aimed at undistributed profits of personal holding companies; statute operated "uniformly" on all resident shareholders of such corporations, and the fact

---

[15] Section 50079.1 provides: "A community college district may impose a special tax pursuant to Article 3.5 (commencing with Section 50075). The special taxes shall be applied uniformly to all taxpayers or real property within the district, except that unimproved property may be taxed at a lower rate than improved property." (§ 50079.1.)

classification of personal holding companies for income tax purposes "resulted in a different treatment of the shareholders of such companies, i.e., as partners, was not an insuperable obstacle to the constitutionality of the provisions"]; *California Assn. of Retail Tobacconists v. State of California* (2003) 109 Cal.App.4th 792, 841 [135 Cal.Rptr.2d 224] (*Retail Tobacconists*) [upholding initiative that imposed higher excise taxes on tobacco products than on cigarettes; "[t]he equal protection clause does not prevent the Legislature, or the electorate by initiative, from asserting its taxing power or adjusting its taxing legislation to differences in situation and classifying accordingly . . ."]; *Marsh & McLennan of Cal., Inc. v. City of Los Angeles* (1976) 62 Cal.App.3d 108, 119–122 [132 Cal.Rptr. 796] [upholding city business tax imposed on insurance brokers, but not insurance agents; "the essential differences between insurance brokers and agents, and based upon the fundamental legal distinction in their respective status as independent contractor and agent, classification for taxation purposes of the two groups is reasonable and not an invidious discrimination"]; *Roth Drug, Inc. v. Johnson* (1936) 13 Cal.App.2d 720, 732–735 [57 P.2d 1022] [upholding sales tax on tangible, but not intangible, property, and on retail, but not wholesale, sales; equal protection clause "does not forbid reasonable discriminations in matters involving taxation" and tax classifications "are recognized as necessary and valid"].)

As the District points out, the threshold for tax legislation to pass constitutional muster against an equal protection challenge is very low. "The party who challenges the constitutionality of a classification in a tax statute bears a very heavy burden; it must negate any conceivable basis [that] might support the classification." (*Retail Tobacconists, supra,* 109 Cal.App.4th at p. 842.) "If the challenged classification is based on natural, intrinsic or fundamental distinctions that are reasonable in their relation to the object of the legislation, then it will be deemed to be valid and binding." (*Id.* at pp. 841–842.)

The District also cites a series of cases involving national banks and the classification of property as either a "fixture," which is a form of real property on which national banks can be taxed, or "personal" property, as to which they are tax exempt. (E.g., *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 885–892 [264 Cal.Rptr. 139, 782 P.2d 278] (*Crocker National Bank*) [holding bank's electronic data processing equipment was erroneously classified as a fixture, and was, instead, personal property]; *Simms v. County of Los Angeles* (1950) 35 Cal.2d 303, 308–318 [217 P.2d 936] [holding bank vault doors and counterlines were properly classified as fixtures, and like property of other businesses, such as jewelers, also should have been classified as fixtures; however, bank failed to show resulting economic disparity and therefore failed to establish equal protection claim under the federal Constitution or Cal. Constitution former art. 1, § 11 (now Cal. Const., art. IV, § 16), requiring "uniform operation" of all general

laws];[16] *Trabue Pittman Corp. v. County of Los Angeles* (1946) 29 Cal.2d 385, 391–400 [175 P.2d 512] (*Trabue*) [holding vault door and doorframe were fixtures, taxable as real property and taxable to the owner of the building leased by the bank; to achieve "uniformity of taxation," assessors "must be allowed to act on the basis of outward appearances" and are not bound by private agreements between lessors and lessees, or by who installed the improvement, or by the "trade fixture" doctrine].)

In *Crocker National Bank*, the Supreme Court also addressed the standard of review applicable to a trial court's ruling that bank property is a "fixture" or "personal property." Although a "mixed" question of fact and law, the court held the inquiry is "predominantly legal" subject to de novo review. (*Crocker National Bank, supra*, 49 Cal.3d at p. 888.) This standard, observed the court, was also "supported by the following consideration. Taxation must, of course, be uniform and the tax laws uniformly applied. (See *Trabue Pittman Corp. v. County of L.A., supra*, 29 Cal.2d at pp. 392–393, 397–398.) Uniformity depends on proper classification. And proper classification is furthered through the application of independent review." (*Crocker National Bank*, at pp. 888–889.) As noted in *Trabue*, the court had addressed the classification of bank property as a fixture or personalty and set forth the proper test for assessors to use in classifying property as such. (*Trabue, supra*, 29 Cal.2d at pp. 391–401.) In doing so, the court had rejected the argument that the "trade fixture" doctrine (as applied in the landlord and tenant context) should control for tax classification purposes, pointing out use of the doctrine would result in different tax treatment of the *same* property, depending merely on the ownership arrangement. That, the court had said, would be contrary to the principle of "uniformity," the purpose of which is to ensure " 'that all property in the state carry its fair burden and contribute its just amount in taxation.' " (*Id.* at p. 398.)

As the District points out, the Legislature is deemed to be aware of existing law. (See *City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 606 [110 Cal.Rptr.3d 718, 232 P.3d 701] [noting "legal presumption that the Legislature is deemed to be aware of existing judicial decisions that have a direct bearing on the particular legislation enacted"]; *Yu v. University of La Verne* (2011) 196 Cal.App.4th 779, 788 [126 Cal.Rptr.3d 763] [" ' "We presume that the Legislature, when enacting a statute, was aware of existing related laws and intended to maintain a consistent body of rules." ' "].) The District thus contends the Legislature—in using the term

---

[16] In "tax matters," the requirements of former article I, section 11 (now art. IV, § 16) of the state Constitution—requiring that all laws of the general nature have uniform application—"are substantially the same as those of the equal protection clause of the Fourteenth Amendment." (*Simms v. County of Los Angeles, supra*, 35 Cal.2d at p. 313.)

"uniformly" in section 50079—must have been referring to the constitutionally based equal protection principles reflected in the above cited cases.

Therefore, says the District, it may establish rational classifications and impose different tax rates, so long as all taxpayers or property within a classification are treated the same. The District maintains wholesale exemptions for senior and disabled homeowners are not inconsistent with a construction that allows for classification and differential taxation of other taxpayers and property. It also maintains the provisions of other tax enabling statutes, such as section 50079.1, which was added four years after section 50079, are irrelevant. (See *Wolski v. Fremont Investment & Loan* (2005) 127 Cal.App.4th 347, 357 [25 Cal.Rptr.3d 500] [materials that postdate passage of legislation often do not bear on intent of drafters].)

We agree with plaintiffs that the plain language of section 50079 and attendant rules of statutory construction demonstrate the definitional language at issue is language of limitation and does not empower school districts to classify taxpayers and property, and impose different tax rates.

■ We begin by observing that if section 50079 did not include the language in question, there would be no question that school districts could create rational tax classifications and impose differential tax rates. That is because fundamental equal protection principles apply to every tax statute, regardless of the statutory language. Thus, if the Legislature had intended to delegate to school districts the broadest taxing authority allowed by law—that is, taxing authority bounded only by equal protection principles—it needed only to have authorized school districts to impose special taxes, or in other words, it needed only to have enacted section 50079, subdivision (a). That would mean, however, that the *entirety* of subdivision (b) is meaningless surplusage, a result that cannot reasonably be ascribed to the Legislature in any context, and particularly not in legislation specifying the bounds of delegated taxing power.[17] (See *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1155 [45 Cal.Rptr.3d 21, 136 P.3d 821] ["One effect of plaintiffs' reading would be to render the FPA's definition of 'timberland' (see [Pub. Resources Code,] § 4526) partly surplusage."]; *Hughes Electronics Corp. v. Citibank Delaware* (2004) 120 Cal.App.4th 251, 270, fn. 18 [15 Cal.Rptr.3d 244] ["the interpretation urged by DIRECTV would render entire portions of [Code of Civil Procedure] section 340(c) 'meaningless surplusage' "].)

■ Similarly, there was no need for the Legislature to have expressly allowed exemptions for senior and disabled taxpayers if the definitional

---

[17] At oral argument, the District acknowledged that, in final analysis, its position is that section 50079, subdivision (b) is surplusage.

language at issue, in and of itself, allowed school districts to create rational tax classifications and impose different tax burdens on different taxpayers. (See *Fox Bakersfield Theatre, supra*, 36 Cal.2d at pp. 142–144.) We will not ascribe to the core definitional language a meaning that renders the explicit exemptions thereto meaningless.[18] (See *Summerfield v. Windsor Unified School Dist.* (2002) 95 Cal.App.4th 1026, 1032 [116 Cal.Rptr.2d 233] [refusing to adopt definition of term "provisional credentials" rendering an exception to a statute based on that term's meaningless surplusage].)

Any doubt that the definitional language in question does not, in and of itself, authorize the classification and differential taxation of taxpayers and property is dispelled by the language of section 50079.1. This section immediately follows section 50079, authorizes community colleges to impose special taxes, and contains the same language at issue here—that "special taxes shall be applied uniformly to all taxpayers or real property within the district." (§ 50079.1.) Section 50079.1 does not include exemptions for senior or disabled taxpayers. It does, however, provide that "unimproved property may be taxed at a lower rate than improved property." (*Ibid.*) The inclusion of this *additional* language—expressly allowing community college districts to classify and differentially tax real property—makes manifest that the definitional language, alone, does not allow districts to establish rational classifications and impose different tax rates.

█ The equal protection cases relied on by the District are inapposite. Plaintiffs are not challenging Measure H on the ground its classifications and different tax rates are constitutionally infirm.[19] Accordingly, the District's reliance on equal protection analytical tools (e.g., tax legislation will be upheld if any rational reason supports it, party challenging constitutionality of a tax classification bears a very heavy burden) is misplaced. Rather, the

---

[18] On rehearing, the District argued that equating the statutory "apply uniformly" language with constitutional equal protection principles, does not render the senior and disabled exemptions surplusage because exemptions cannot be implied and must be explicit, citing *Associated Beverage Co. v. Board of Equalization* (1990) 224 Cal.App.3d 192 [273 Cal.Rptr. 639]. This argument confuses the scope of the power to tax with the implementation of a specific tax that provides for exemptions. In *Associated Beverage Co.*, the taxpayer claimed sales of soft drinks in reusable bottles were exempt from the state's sales and use tax. The court disagreed, holding there was no applicable exemption. (*Id.* at pp. 208–216.) The case had nothing to do with the scope of the state's taxing power, or that of any other governmental body. The state's power to tax inherently includes the power to limit a tax through exemptions, subject only to constitutional limitations. Likewise, had the Legislature delegated to school districts the state's full power to impose special taxes, subject only to constitutional equal protection principles, as the District claims, that power would include the power to provide exemptions. Accordingly, under the District's construction of the language at issue—that it merely restates constitutional equal protection principles—the express authorization to provide exemptions for senior and disabled taxpayers is meaningless surplusage.

[19] Nor could they succeed on such a challenge given the minimal threshold required to pass constitutional muster. (See *Retail Tobacconists, supra*, 109 Cal.App.4th at p. 844.)

instant case is one of statutory construction—does Measure H exceed the bounds of the taxing power delegated to school districts by the Legislature through section 50079. For the reasons we have discussed, we conclude the answer is "yes." Given the language of section 50079, the comparative language of section 50079.1, and the basic rules of statutory construction that guide us, it is apparent the Legislature, in including the definitional language at issue, was not simply rearticulating fundamental equal protection principles, under which governmental entities have expansive taxing authority. Rather, the statutory language and context demonstrate the definitional language is language of limitation to which the Legislature made certain, limited exceptions.

### 2. Legislative History

Because we conclude the meaning of section 50079 can be discerned from its language and the statutory context of which it is a part, we need not consider its legislative history. We nevertheless have reviewed the legislative history, supplied by both parties to the trial court, and it confirms what the plain language of section 50079 indicates—that the definitional language in question is language of limitation. (See *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1335 [104 Cal.Rptr.3d 219, 223 P.3d 77] [although statutory language was "plain" it was "helpful to look at [the statute's] legislative history"]; *McCarther, supra,* 48 Cal.4th at p. 116 [although "the plain language of the statute is clear, an examination of [the statute's] legislative history confirms that the statute was not intended to broadly apply to all types of sick leave policies"].)[20]

Section 50079 was enacted by Assembly Bill No. 1440 (1987–1988 Reg. Sess.), which was carried by Assemblyman Tom Hannigan at the request of the Davis Unified School District and supported by a number of other school districts in which voters had recently approved special taxes. (See Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1440 (1987–1988 Reg. Sess.) as amended June 22, 1987, p. 2.) As introduced, the legislation broadly provided that subject to Proposition 13, "any school district may impose qualified special taxes upon the district pursuant to the procedures established in Article 3.5 (commencing with Section 50075) and any other applicable procedures provided by law." (Legis. Counsel's Dig., Assem. Bill No. 1440 (1987–1988 Reg. Sess.) 4 Stats. 1987, Summary Dig., p. 33, italics omitted.)

The bill was referred to the Assembly Revenue and Taxation Committee where it was amended, at the insistence of Assemblyman Charles W. Bader,

---

[20] As did the trial court, we take judicial notice of the complete legislative history of section 50079. (Evid. Code, § 459, subd. (a).)

to add the definitional language at issue. (See Assem. Bill No. 1440, Assem. Final Hist. (1987–1988 Reg. Sess.); Robert B. Caine, Superintendent of Kentfield School Dist., letter to Annette Porini, Chief of Staff to Assemblyman Thomas Hannigan, June 11, 1987, p. 1 [referencing "Bader amendment"].)[21] In his statement on the Assembly Floor urging passage of the bill, Assemblyman Hannigan explained it had been amended "in the Revenue and Taxation Committee to make it clear that this special tax must apply uniformly to all taxpayers in the district." (Assemblyman Hannigan, statement to Assem. Floor on Assem. Bill No. 1440 (1987–1988 Reg. Sess.) May 1987; see Assem. Off. of Research, 3d reading Rep. on Assem. Bill No. 1440 (1987–1988 Reg. Sess.) as amended May 19, 1987, p. 1.)

Kentfield School District, a supporter of the legislation, then apprised Assemblyman Hannigan's office of several concerns, shared by other school districts, about the amended legislation. (See Robert B. Caine, Superintendent of Kentfield School Dist., letter to Annette Porini, Chief of Staff to Assemblyman Thomas Hannigan, June 11, 1987, p. 1.) Kentfield, along with Mill Valley, Albany and Lagunitas school districts, had obtained an opinion letter on the amended legislation, which it provided to Assemblyman Hannigan's office. (See Thomas Steele, letter to Robert Caine, Superintendent of Kentfield School Dist., June 9, 1987.) The opinion letter concluded the Legislature · probably had the power to validate the districts' newly enacted parcel taxes, particularly if the legislation was enacted prior to the effective date of the tax measures. (*Id.* at p. 3.)

However, the opinion letter also stated the bill as amended "would not appear to provide the necessary authority for the districts to impose their special taxes." (Thomas Steele, letter to Robert Caine, Superintendent of Kentfield School Dist., June 9, 1987, p. 3.) First, the Kentfield, Mill Valley and Lagunitas special tax measures all allowed exemptions for individuals 65 years and older, and the Albany tax differentiated between and imposed different tax rates on residential and nonresidential property. (*Id.* at pp. 2, 4.) The opinion letter observed "the plain meaning of the language suggests that no exemptions would be tolerated. In addition, the bifurcated rate provided by the Albany special tax also appears inconsistent with this phrase, since the tax is apparently not applied uniformly to residential and nonresidential properties." (*Id.* at p. 4.) Second, the amended bill did not appear to validate existing special taxes, but only to authorize taxes approved after enactment of

---

[21] While letters from individual proponents of legislation "are generally not considered in construing a statute, as the court's task is to ascertain the intent of the Legislature as a whole in adopting a piece of legislation" (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062 [48 Cal.Rptr.2d 1, 906 P.2d 1057]), they nonetheless may aid in understanding the legislative process by alluding "to arguments and discussions which actually took place during" the process (*Courtesy Ambulance Service v. Superior Court* (1992) 8 Cal.App.4th 1504, 1512, fn. 6 [11 Cal.Rptr.2d 161]).

the legislation. (*Ibid.*) Counsel provided the districts with proposed amendments "to resolve both of the problems" with the amended legislation, which were also forwarded to Assemblyman Hannigan's office.[22] (Thomas Steele, letter to Robert Caine, Superintendent of Kentfield School Dist., June 9, 1987, at p. 5.)

Representatives of Kentfield then met with Assemblyman Hannigan's staff, but were unable to persuade Hannigan to revisit the added language and, in fact, were "persuaded . . . to drop any attempt to rewrite Section 50079.1(b), the Bader amendment." (Robert Caine, Superintendent of Kentfield School Dist., letter to Annette Porini, Chief of Staff to Assemblyman Thomas Hannigan, June 11, 1987, p. 1.) The districts, accordingly, abandoned their proposed amendments and "[i]nstead urge[d] . . . only that language be added such as we presently propose making it clear that exemptions for senior citizens (like those provided by the three Marin County school district taxes that were recently passed) are not prohibited by AB 1440." (*Ibid.*) The districts also proposed language expressly validating parcel tax measures approved after Proposition 62 to spare school districts "the enormous additional expense and effort required to resubmit the tax measure[s] to the electorate." (Robert Caine, Superintendent of Kentfield School Dist., letter to Annette Porini, Chief of Staff to Assemblyman Thomas Hannigan, June 11, 1987, p. 1.)

Kentfield, Mill Valley, Albany and Lagunitas school districts also made a direct appeal to Senator John Garamendi, Chairman of the Senate Committee on Revenue and Taxation, to address problems facing districts with recently approved special tax measures. (James W. Burnder, Jr., Director of Governmental Affairs, letter to Sen. John Garamendi, Chairman of the Sen. Com. on Revenue and Taxation, June 16, 1987, p. 1.) The districts urged that their proposed validation language be added, as well as an exemption for seniors. (*Id.* at p. 2.) They explained to Senator Garamendi: "AB 1440, as amended in the Assembly (the 'Bader Amendment'), requires that the special tax be

---

[22] The District contends the June 9 opinion letter has no significance in light of a letter from the school districts' counsel dated June 10, which is also included in the legislative history and which the District characterizes as "omitting" any concern about the "apply uniformly" language and a "withdrawal" of the June 9 letter. The letter dated June 9 bears the notation it was sent "VIA TELECOPIER" and includes a separate section at the end discussing "AB 1440." It also references and discusses an enclosed "draft of proposed amendments to AB 1440" designed to "resolve both of the problems" counsel perceived with the "apply uniformly" language that had been added to the bill. (Thomas Steele, letter to Robert Caine, Superintendent of Kentfield School Dist., June 9, 1987, pp. 4–5.) The letter bearing the date of June 10 bears no indication of any haste in transmission and addresses only whether school districts continued to have the power to tax post-Proposition 62, and if they did not, whether the Legislature could pass legislation validating their parcel tax measures passed after the proposition. What is apparent to us is that the letter dated June 9 was sent as an urgency matter and addressed an additional issue, namely the recent amendments to the legislation.

applied 'uniformly to all taxpayers or all properties'. Responding to the concerns of their local communities, three of the four Districts provided a limited exemption from the special tax for senior citizens. Even such well-intentioned efforts appear to be doomed by the sweeping uniformity provision of AB 1440. [¶] Our proposed amendment . . . adds language to make it clear that an exemption for senior citizens is not prohibited."[23] (James W. Burnder, Jr., Director of Governmental Affairs, letter to Sen. John Garamendi, Chairman of the Sen. Com. on Revenue and Taxation, June 16, 1987, p. 2.)

The report prepared for the Senate Revenue and Taxation Committee discussed the concerns expressed by the school districts, noting the "[c]urrent language" of the bill might "not solve" the "problem" faced by all school districts with recently approved taxes. (Sen. Com. on Revenue and Taxation, Rep. on Assem. Bill No. 1440 (1987–1988 Reg. Sess.) as amended June 1, 1987, p. 2.) The report explained: "AB 1440 presently requires that any special tax imposed pursuant to its authority must apply uniformly to all property and all taxpayers in the district. Apparently some of the school district parcel taxes which have been imposed apply differentially to different types of property, and one exempts those aged 65 or older. In its present form this bill may not 'validate' these special taxes."[24] (*Ibid.*) The committee added an exemption for seniors, but made no other changes to the legislation. (Sen. Conc. Sen. Amends. to Assem. Bill No. 1440 (1987–1988 Reg. Sess.) as amended June 22, 1987.)

The report prepared for the concurring vote on the Senate amendments summarized the legislation as follows: "As passed by the Assembly, this bill permitted school districts to impose special taxes with the approval of 2/3 of the voters in the district. Such taxes must be uniform and not discriminate against a class of property or taxpayers. [¶] The Senate amendments makes [*sic*] an exception to the uniformity requirement, which allows special taxes which provide for an exemption for taxpayers age 65 or older." (Sen. Conc. Sen. Amends. to Assem. Bill No. 1440 (1987–1988 Reg. Sess.) as amended June 22, 1987, p. 1.) The Assembly approved the bill as amended, and the

---

[23] Notably, this letter from the school districts, sent after they had been persuaded to "drop any attempt to rewrite" the Bader amendment, made no mention of and did not ask for language allowing property classifications and differential tax rates like those made by the Albany tax measure. (James W. Burnder, Jr., Director of Governmental Affairs, letter to Sen. John Garamendi, Chairman of the Sen. Com. on Revenue and Taxation, June 16, 1987, p. 2.)

[24] As we have discussed, the Kentfield, Mill Valley and Lagunitas school district tax measures all contained senior exemptions; only the Albany tax measure classified and differentially taxed real property.

legislation was signed into law by the Governor on July 2, 1987. (Assem. Bill No. 1440, Assem. Final Hist. (1987–1988 Reg. Sess.).)[25]

This legislative history confirms that the definitional language at issue is language of limitation. As we have discussed, there was no need to include this language if the Legislature intended school districts to have the broadest possible taxing authority bounded only by constitutional equal protection principles—and which they would have had under the provisions of the bill as introduced. The vigor of the debate over the "Bader amendment," which added the definitional language, further reinforces the intent was to constrain the districts' taxing power. It is significant that school districts that were in immediate need of the legislation and closely following its course through the Legislature, opposed the language and tried on multiple fronts to have it removed from the bill—specifically because it appeared to preclude the kind of differential tax treatment required by their special tax measures, including treating seniors differently from other taxpayers and treating residential properties differently from commercial properties. When it became clear the districts could not effect removal of the language, they sought and obtained only an exemption for seniors, which was described in the committee report for the concurring vote as an "*exception* to the uniformity requirement." (Sen. Conc. Sen. Amends. to Assem. Bill No. 1440 (1987–1988 Reg. Sess.) as amended June 22, 1987, p. 1, italics added.) Thus, it is apparent the Legislature and school districts understood districts otherwise did not have authority to classify taxpayers and property and impose differential tax rates.[26]

---

[25] Section 50079 was amended in 2006 to allow an additional exemption for "persons receiving Supplemental Security Income for disability, regardless of age." (Stats. 2006, ch. 41, § 1, p. 307.) The report prepared for the Assembly Committee on Revenue and Taxation explained: "Existing law allows any school district to impose qualified special taxes upon the district, in accordance with specified procedures. Qualified special taxes must apply uniformly to all taxpayers or real property within the district and do not include special taxes imposed on a particular class of property or taxpayers. Currently, school districts are authorized to exempt persons aged 65 years or older." (Assem. Com. on Revenue and Taxation, Rep. on Assem. Bill No. 385 (2005–2006 Reg. Sess.) as amended Jan. 4, 2006, p. 1.) The new bill "merely expands a current exemption" to allow school districts to also exempt disabled persons living on fixed incomes. (*Id.* at pp. 1–2; see also Sen. Com. on Revenue and Taxation, Rep. on Assem. Bill No. 385. (2005–2006 Reg. Sess.), as amended Jan. 4, 2006, p. 1.) The amendment was unanimously approved by both houses, and signed into law by the Governor on May 31, 2006. (See Assem. Bill No. 385, Assem. Final Hist. (2005–2006 Reg. Sess.).)

[26] That legislative materials described Assembly Bill No. 1440 (1987–1988 Reg. Sess.) as "clarify[ing]" that school districts could continue to impose special taxes, does not, as the District argued on rehearing, establish that the Legislature intended to delegate taxing authority to the districts bounded only by established equal protection principles. Assembly Bill No. 1440 did, indeed, "clarify" in the wake of the uncertainty left by Proposition 62, that school districts had the authority to impose special taxes. As amended and enacted, the legislation also imposed limits on that authority.

The District contends this cannot be the case because it assertedly results in manifest unfairness—i.e., that all parcels must bear the same tax, regardless of size and character. The Legislature was aware, however, that uniform parcel taxes were considered "more inequitable" than ad valorem property taxes *because* all parcels, regardless of size, are subject to the same tax. (Assem. Com. on Revenue and Taxation, Rep. on Assem. Bill No. 1440 (1987–1988 Reg. Sess.) as introduced Mar. 4, 1987, p. 2.) Nevertheless, the Legislature made no adjustments or provisions in this regard. Nor did the school districts, after being persuaded to "drop any attempt to rewrite" the "Bader amendment" (Robert Caine, Superintendent of Kentfield School Dist., letter to Annette Porini, Chief of Staff to Assemblyman Thomas Hannigan, June 11, 1987, p. 1), seek language that would allow for the classification and differential tax treatment of parcels by size or use (as they did, successfully, to allow for an exemption for seniors). (Moreover, as we discuss in the next part, other local districts did seek such authority, and their enabling statutes, while containing the same "apply uniformly" language as section 50079, subdivision (b)(1); also expressly allow limited classification and differential taxation of property.)[27] Finally, while the District suggests no special tax can be fairly crafted unless it establishes property classifications and imposes different tax rates, we note that of the four school districts that were heavily involved when the legislation was amended, only one had a special tax that classified and differentially taxed local property. The other three did not; their special tax measures contained only an exemption for seniors—as is now expressly allowed by the statute.

### 3. Related Legislation

As we have discussed, section 50079 was one of the first statutes enacted in the wake of Proposition 62 empowering local districts to levy special taxes. Many share the definitional language at issue here, and an examination

---

[27] The enabling statute at issue in *Heckendorn v. City of San Marino* (1986) 42 Cal.3d 481 [229 Cal.Rptr. 324, 723 P.2d 64], a case the District cited for the first time on rehearing, also *permitted the classification of property. In that case, the city imposed a special tax for fire and police services pursuant to section 53978, which provides that local agencies "may establish zones or areas within the local agency and may restrict the levy of the special tax to those zones or areas." (§ 53978, subd. (a).) The statute further specifies "such special taxes shall be levied on a parcel, class of improvement to property, or use of property basis, or a combination thereof . . . ." (Id.,* subd. (b).) A resident challenged the city's graduated tax as effectively being an ad valorem tax, prohibited by Proposition 13. (*Heckendorn, supra,* at pp. 485–486.) The Supreme Court disagreed since the tax was not levied upon an assessment and also was authorized by the terms of the enabling statute. (*Id.* at pp. 487–488.) The court also noted a broad construction of the statutory language was warranted because "otherwise" it would "lead to the unjust result that any special tax imposed on a parcel basis under this statute would have *to be equal for a lot of 9,000 square feet and an estate the size of Huntington Library." (Id.* at p. 488.) The language of section 50079 is significantly different, and deliberately so, as the legislative history demonstrates.

of several of these statutes and their legislative history provides additional illumination as to the Legislature's intent with respect to this language.[28]

### a. *Local Hospital Districts*

The year after the Legislature enacted section 50079, it enacted section 53730.01, authorizing local hospital districts owning their own hospital facilities to impose "special taxes" in accordance with Proposition 13. (Stats. 1998, ch. 345, § 1, p. 2746; Assem. Bill No. 3596, Assem. Final Hist. (1987–1988 Reg. Sess.); see Assem. Com. on Local Government, Rep. on Assem. Bill No. 3596 (1987–1988 Reg. Sess.) as amended Apr. 27, 1988, p. 2 [purpose of legislation was to rectify the "problem" caused by Proposition 62 and provide express statutory authority for hospital districts to levy taxes consistent with Prop. 13].) At the first committee hearing, before the Assembly Committee on Local Government, the bill was amended to include the same definitional language and senior exemption that had been added to section 50079. (Assem. Com. on Local Government, Rep. on Assem. Bill No. 3596 (1987–1988 Reg. Sess.) as amended Apr. 27, 1988, pp. 2–3 [language "taken directly from provisions in AB 1440 (Hannigan) of 1987, which gave specific authority to school districts to levy special taxes" and addressed "the concern expressed by the California Association of Realtors . . . about the prospect of a hospital district, or any other type of local agency, imposing a general or special tax on new homebuyers alone"].[29] At the request of the Association of California Hospital Districts, additional

---

[28] While subsequent legislation often has no bearing on the interpretation of an earlier statute, where the Legislature employs identical language in the later statute, and the legislative history of the later statute expressly references the earlier statute, the purpose and intent of the later statute has some relevance to the purpose and intent of the earlier statute. (See *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 54 & fn. 17 [51 Cal.Rptr.3d 55, 146 P.3d 510]; *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 195 [25 Cal.Rptr.3d 298, 106 P.3d 958]; *Eu v. Chacon* (1976) 16 Cal.3d 465, 470 [128 Cal.Rptr. 1, 546 P.2d 289]; *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 589–590 & fn. 13 [48 Cal.Rptr.3d 340].) We take judicial notice of this legislative history pursuant to Evidence Code section 452 and in accordance with Evidence Code section 459, which included giving notice to the parties and an opportunity to respond. The District additionally addressed this legislative history on rehearing.

[29] The District views these references to the housing industry's concern about taxes on new residential properties as definitive on the issue of the Legislature's intent and as establishing that the Legislature intended to prohibit only taxes that apply to a single class of taxpayers or property, specifically new residential housing, and to allow all other tax classifications that pass constitutional muster. We do not agree the legislative history of section 50079, or of the subsequently enacted enabling statutes using the same "apply uniformly" language, is so constrained. Moreover, even focusing on the concerns expressed by the housing industry, we do not agree the Legislature intended that school districts could classify parcels as newly created or newly improved and impose on such parcels a significantly higher tax rate. While such classifications would not impose the tax on those parcels alone, it would nevertheless burden them with a grossly disproportionate share of the tax—a result permissible under minimal equal protection principles, but one the Legislature plainly did not intend.

exemptions were added for certain agricultural and timber property. (Amendments to Assem. Bill No. 3596 (1987–1988 Reg. Sess.) as amended May 16, 1988; Ron Youngren for Assoc. of Cal. Hospital Districts, letter to Hon. Dominic L. Cortese, Chair of Assembly Local Government Com., May 10, 1988.)

In the Assembly Committee on Revenue and Taxation, questions were raised about the requirement that any tax apply uniformly and the proposed exemptions. (Assem. Com. on Revenue and Taxation, Rep. on Assem. Bill No. 3596 (1987–1988 Reg. Sess.) as amended May 16, 1988, p. 4.) As to the exemption for seniors, specifically, the report stated: "This bill follows the AB 1440 example in requiring any hospital district special tax to be uniform except that an exemption may apply to senior citizens. Presumably in the case of school special taxes in AB 1440, the rationale for allowing that exemption is that senior citizens receive less direct benefit from schools than other citizens. Does that rationale apply in the case of hospitals?" (*Ibid.*) No changes, however, were made to the exemptions.

The hospital district bill then moved to the Senate Committee on Local Government, where questions were again raised as to the wisdom of the exemptions: "AB 3596 allows hospital districts to grant local exemptions to senior citizens, to agricultural land, and to timberland. If these exemptions are desirable public policy, will other interest groups seek their own special treatment? The Committee may wish to consider whether special taxes should be uniform or should permit local exemptions." (Sen. Local Government Com., Rep. on Assem. Bill No. 3596 (1987–1988 Reg. Sess.) as amended June 29, 1988, p. 2.) Upon second reading in the Senate, the bill was amended to remove all the exemptions. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 3596 (1987–1988 Reg. Sess.) as amended Aug. 18, 1989.) The Assembly concurred, and the bill was signed into law by the Governor.[30] (Assem. Bill No. 3596, Assem. Final Hist. (1987–1988 Reg. Sess.).)

### b. *Local Recreation and Park Districts*

Two years later, the Legislature authorized recreation and park districts to impose special taxes. (Pub. Resources Code, § 5789.1, subd. (a) [originally

---

[30] As enacted, section 53730.01 provides: "A hospital district established pursuant to Division 23 (commencing with Section 32000) of the Health and Safety Code whose hospitals are wholly owned and are operated by the district shall have the authority to impose special taxes pursuant to Article XIII A of the California Constitution and Article 3.5 (commencing with Section 50075) of Chapter 1 of Part 1 of Division 1 and consistent with Article 3.7 (commencing with Section 53720). The board of directors shall determine the basis and nature of any special tax and its manner of collection. [¶] 'Special taxes' as used in this section, means special taxes which apply uniformly to all taxpayers or all real property within the hospital district." (§ 53730.01.)

codified as Pub. Resources Code, former § 5784.39, repealed by Stats. 2001, ch. 15, § 3, p. 37].) As introduced, this legislation also did not include the definitional language at issue. (Assem. Com. on Local Government, Rep. on Assem Bill No. 4158 (1989–1990 Reg. Sess.) as introduced Mar. 2, 1990, p. 2 ["Since the passage of Proposition 62, the Legislature has authorized school districts, library districts and county service areas to impose special taxes. The legislation for school and library districts required that the taxes apply uniformly to all taxpayers. This bill does not make that requirement."].)

In the Senate, the bill was amended to add the definitional language. Initially, no exemptions were provided. However, upon lobbying by a local park district, the Senate further amended the legislation to allow park districts to differentially tax improved and unimproved property. (Sen. Local Government Com., Rep. on Assem. Bill No. 4158 (1989–1990 Reg. Sess.) as amended June 12, 1990, p. 1 [while the language of the bill followed "precedent" authorizing other local entities, including school districts, to levy special taxes, the Georgetown Park and Recreation District wanted to levy a lower tax on unimproved property].)

The report prepared for the Assembly's concurring vote thus explained that the Senate amendments "[c]onform the authority granted in this bill to existing provisions governing special taxes," although "[g]enerally, special districts have not been authorized to levy a different tax rate on improved versus unimproved property." (Assem. Conc. Sen. Amends. to Assem. Bill No. 4158 (1989–1990 Reg. Sess.) as amended June 21, 1990.) The Assembly approved the bill as amended, and the legislation was signed into law by the Governor.[31]

### c. *Community College and Other Local Districts*

The following year, the Legislature passed omnibus legislation adding statutes to a number of codes, all authorizing local districts to impose special taxes. (Legis. Counsel's Dig., Sen. Bill No. 158 (1991–1992 Reg. Sess.) 4 Stats. 1991, Summary Dig., pp. 29–30.) The report prepared for the Senate Committee on Local Government explained that, having enacted a number of

---

[31] Public Resources Code section 5789.1 (originally codified as Pub. Resources Code, former § 5784.39, repealed by Stats. 2001, ch. 15, § 3, p. 37) provides in pertinent part: "A district may levy special taxes pursuant to: [¶] (a) Article 3.5 (commencing with Section 50075) of Chapter 1 of Part 1 of Division 1 of Title 5 of the Government Code. The special taxes shall be applied uniformly to all taxpayers or all real property within the district, except that unimproved property may be taxed at a lower rate than improved property." (Pub. Resources Code, § 5789.1, subd. (a).)

such enabling statutes in prior sessions, including for "School Districts," "Local Hospital Districts," and "Recreation & Park Districts," the purpose of the comprehensive bill was to "complete[] the job by allowing nearly all special districts to ask their voters if they want to tax themselves." (Sen. Local Government Com., Rep. on Sen. Bill No. 158 (1991–1992 Reg. Sess.) as amended Feb. 11, 1992, pp. 1–2; see Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 158 (1991–1992 Reg. Sess.) as amended May 15, 1991, p. 2 [listing prior legislation authorizing local districts to levy special taxes, including § 50079, and identifying the 15 local districts for which such authorization would be provided by Sen. Bill No. 158 (1991–1992 Reg. Sess.)].)

The committee report further explained "[t]he language in SB 158 is identical to the language worked out and approved by the Legislature for special districts in bills over the last two years." (Sen. Local Government Com., Rep. on Sen. Bill No. 158 (1991–1992 Reg. Sess.) as amended Feb. 11, 1992, p. 2.) Accordingly, every proposed enabling statute contained the language that first appeared in section 50079—that a special tax must apply "uniformly to all taxpayers or all real property" within the district. Every proposed statute also contained the additional language that first appeared in Public Resources Code section 5789.1, subd. (a)—allowing unimproved and improved property to be taxed at different rates. (Sen. Bill No. 158 (1991–1992 Reg. Sess.) as enacted by Stats. 1991, ch. 70, p. 190.)

Community college districts were among the local districts included in this omnibus legislation. We have already discussed the plain language of section 50079.1. Its legislative history is also of note. As introduced, the legislation, as it pertained to community colleges, proposed amending section 50079 to include both school districts and community college districts. (Sen. Bill No. 158 (1991–1992 Reg. Sess.) as introduced Jan. 10, 1991.) However, objections were raised to community college districts being allowed to exempt senior citizens from their special taxes. (See Amend. to Sen. Bill No. 158 (1991–1992 Reg. Sess.) as amended Mar. 19, 1991, p. 1; Peter M. Detwiler, letter to Office of State Sen. Marian Bergeson (bill author) Apr. 22, 1991, and May 6, 1991.) Accordingly, the legislation was amended to delete the language adding community college districts to section 50079 and to add another new enabling statute specifically pertaining to community college districts, section 50079.1. The language of this proposed statute was identical to that of every other proposed enabling statute to be added by the omnibus bill, and thus specified that any "special taxes shall be applied uniformly to all taxpayers or real property within the district, except that unimproved property may be taxed at a lower rate than improved property." (Amend. to

Sen. Bill No. 158 (1991–1992 Reg. Sess.) as amended Mar. 19, 1991, p. 1.) As amended, the omnibus bill was unanimously approved by both houses and signed into law by the Governor. (Sen. Bill No. 158, Sen. Final Hist. (1991–1992 Reg. Sess.).)[32]

This string of enabling legislation further demonstrates that the definitional language at issue, originating in section 50079, is language of limitation and does not, in and of itself, authorize local districts to establish classifications and impose differential tax rates. In authorizing hospital districts to impose special taxes, for example, the Legislature initially added, but ultimately removed, exemptions for seniors and for protected agricultural/timber lands. Significantly, the contemplated exemptions were viewed as *exceptions* to the requirement that such taxes "apply uniformly." (E.g., Sen. Local Government Com., Rep. on Assem. Bill No. 3596 (1987–1988 Reg. Sess.) as amended June 29, 1988, p. 2 ["The committee may wish to consider whether special taxes should be uniform *or* should permit local exemptions." (italics added)]; Assem. Com. on Revenue and Taxation, Rep. on Assem. Bill No. 3596 (1987–1988 Reg. Sess.) as amended May 16, 1988, p. 4 ["This bill follows the AB 1440 example in requiring any hospital district special tax to be uniform *except* that an exemption may apply to senior citizens." (italics added)].)

It is also apparent that when the Legislature added the "apply uniformly" language to these enabling statutes, it also viewed classification and differential tax rates as matters requiring *express* authorization. Thus, the Legislature included in most of these statutes not only the core definitional language that was first added to section 50079, but also included (e.g., for recreation and park districts and community college districts, but not for hospital districts) *additional* language authorizing the districts to classify property as improved or unimproved and to tax unimproved property at a lower rate. There was no need to include this additional language if the definitional language, alone, empowered the districts to create classifications and impose different tax rates.

---

[32] The District has never provided a cogent explanation, either in its briefing on appeal or on rehearing, why the Legislature included additional language in section 50079.1 expressly authorizing community college districts to classify and differentially tax real property, if the "apply uniformly" language taken from section 50079 already allowed for such, as the District claims. Instead, the District has consistently argued none of the subsequently enacted enabling statutes, including section 50079.1, bear on the Legislature's intent as to section 50079. It is the District's position, in short, that section 50079 should be read in a vacuum and that "apply uniformly" can and should be read differently and more broadly in that statute, than in the subsequently enacted enabling statutes that "completed the job" commenced by section 50079, including section 50079.1. We do not agree section 50079 should be sundered from the statutory context of which it is a part, particularly given the Legislature's explicit and repeated references to the statute as it enacted additional enabling statutes employing the same language.

Indeed, the report prepared for the Assembly concurring vote on the Senate amendments to the park district legislation observed that while the amendments (adding the "apply uniformly" language and the language allowing differential taxation of improved and unimproved property) "[c]onform the authority granted in this bill to existing provisions governing special taxes" generally "special districts *have not been authorized* to levy a different tax rate on improved versus unimproved property." (Assem. Conc. in Sen. Amends. to Assem. Bill No. 4158 (1989–1990 Reg. Sess.) as amended June 21, 1990, italics added.) There could hardly be a more clear statement that the core "apply uniformly" language does not imbue districts with the authority to create classifications and impose differential tax rates, and that the Legislature must provide express authority to districts to do so.[33]

 In sum, the considerations that guide us in determining legislative intent—the plain language and legislative history of the statute in question, and of other statutes enacted for the same reason and having the same purpose and employing the same language—compel the conclusion section 50079 does not authorize school districts to impose special taxes that classify and differentially tax property within the district.[34]

---

[33] On rehearing, the District asked that we also take judicial notice of legislation that was introduced in 1988 as Assembly Bill No. 4431 (1987–1988 Reg. Sess.), but was never enacted. The District contends this aborted legislative effort confirms "apply uniformly" as used in section 50079 merely restates constitutional equal protection principles, thus allowing rational classifications and differential tax rates. We decline to take judicial notice of this proposed, but never enacted, legislation. (See *Delaney v. Baker* (1999) 20 Cal.4th 23, 30, fn. 3 [82 Cal.Rptr.2d 610, 971 P.2d 986] [declining to take judicial notice of legislative history of proposed statutory amendments that were not enacted; such history was "irrelevant"]; *Chino MHC, LP v. City of Chino* (2012) 210 Cal.App.4th 1049, 1068 [148 Cal.Rptr.3d 753] [declining to take judicial notice of proposed legislation; " 'Legislature's failure to enact a proposed amendment to an existing statutory scheme offers only limited guidance, if any, concerning the Legislature's original intent. [Citations.]' "], quoting *Martin v. Szeto* (2004) 32 Cal.4th 445, 451 [9 Cal.Rptr.3d 687, 84 P.3d 374].) We note, however, that even the legislative material to which the District referred does not support its assertion that "apply uniformly" has a singular meaning in the context of taxation, namely minimal constitutional equal protection principles, which the Legislature necessarily must have intended. The District quoted from an analysis by the Department of Finance, for example, that stated "[t]he definition of uniformity in this bill is unclear" and then suggested several possibilities (not one of which used constitutional equal protection terminology). For the reasons we have discussed, we do not think the language of section 50079 is unclear. Moreover, even if it were, the Legislature made its understanding of the phrase "apply uniformly" unmistakably clear as it repeatedly employed the phrase in the subsequently enacted enabling legislation modeled on section 50079.

[34] Our conclusion is not "at odds" with *CBIA, supra*, 206 Cal.App.3d 212, as the District argued on rehearing. As we have discussed, the issue in CBIA was whether exactions imposed by a number of school districts on new housing could be sustained as "special taxes" pursuant to authority derived directly from Proposition 13. The court thus identified and addressed three issues involving the interpretation of *California Constitution, article XIII A, section 4*. (*CBIA*, at pp. 226, 233.) The court first concluded article XIII A, section 4, was·not a grant of taxing authority, and in the absence of enabling legislation in the immediate aftermath of Proposition

## C. *Severability* ·

Having determined Measure H's imposition of a higher tax on commercial or industrial property over 2,000 square feet exceeds the District's taxing authority under section 50079, we now turn to the question of whether the tax measure must be invalidated in its entirety or whether it can be sustained, as the District suggests, in a form consistent with section 50079.

■ "[A] statute that is invalid . . . is not ineffective and inoperative to the extent that its invalid parts can be severed from any valid ones." (See *Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 613 [88 Cal.Rptr.2d 56, 981 P.2d 990].) As we have set forth, Measure H contains a severability provision stating if a court invalidates any part of the measure, the remainder stands. "The presence of such a clause establishes a presumption in favor of severance." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 270 [135 Cal.Rptr.3d 683, 267 P.3d 580]; see *Abbott Laboratories v. Franchise Tax Bd.* (2009) 175 Cal.App.4th 1346, 1357 [96 Cal.Rptr.3d 864] (*Abbott*) ["A severability clause ' " 'normally calls for sustaining the valid part of the enactment . . . .' " ' "]; *Aguiar v. Superior Court* (2009) 170 Cal.App.4th 313, 329 [87 Cal.Rptr.3d 813] [" 'a declaration of severability, although not conclusive, is persuasive evidence of the enacting body's intent' "].)

However, " ' " '[s]uch a clause plus the ability to mechanically sever the invalid part while normally allowing severability, does not conclusively

---

62, the school districts had no power to tax. Accordingly, on that ground, alone, their purported special tax measures were invalid. (*CBIA*, at pp. 226–233.) The court also considered whether the exactions were special taxes "within the meaning of Article XIII A, Section 4." (*Id.* at p. 233, italics and some capitalization omitted.) The court concluded they were not and were, in fact, development fees. (*Id.* at pp. 233–236.) It also concluded the fees were invalid. (*Id.* at pp. 239–240.) The court additionally concluded that even if denominated special taxes, the exactions were not "imposed 'on the district' within the meaning of Article XIII A, Section 4." (*Id.* at pp. 237–239, italics and some capitalization omitted.) It was in this context—discussing Proposition 13's directive that any special tax by any district must be imposed " 'on such district' "—that the court stated the proposition precludes the electorate from imposing on others taxes that are not imposed on themselves "(allowing, of course, for reasonable tax exemptions, such as the one found in section 50079, and for reasonable rate differentials)." (*CBIA*, at p. 237.) This discussion of the language of *article XIII A, section 4*, which applies to all local districts and all special taxes, is not by any means a holding as to the scope of authority specifically delegated to school districts under section 50079. Indeed, section 50079 was referenced only as illustrative of a statutory exemption. Other enabling statues, as we have discussed, authorize the classification and differential taxation of property consonant with the court's pronouncement as to the meaning of the language of *article XIII A, section 4*. In short, *CBIA* did not address the language of section 50079, or its legislative history, or the statutory scheme in which it appears. It is well established that a case is not authority for a proposition it does not address. (See *People v. Knoller* (2007) 41 Cal.4th 139, 155 [59 Cal.Rptr.3d 157, 158 P.3d 731] [" 'An appellate decision is not authority for everything said in the court's opinion but only "for the points actually involved and actually decided." ' "].)

dictate it. The final determination depends on whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable.' " ' (*Gerken v. Fair Political Practices Com.* (1993) 6 Cal.4th 707, 714 [25 Cal.Rptr.2d 449, 863 P.2d 694], italics omitted.)" (*Abbott, supra,* 175 Cal.App.4th at p. 1357.) Condensing these requirements into three components: "[t]o be severable " 'the invalid provision must be grammatically, functionally, and volitionally separable.' " [Citation.]" (*Ibid.*)

Starting with the first two of these components, "[t]o be grammatically separable, the valid and invalid parts of the statute can be separated by paragraph, sentence, clause, phrase, or even single words. (*People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 330 [226 Cal.Rptr. 640].)" (*Abbott, supra,* 175 Cal.App.4th at p. 1358.) When a defect can be " ' "cured by excising any word or group of words," ' " severance may be possible and proper. (*People's Advocate, Inc. v. Superior Court, supra,* 181 Cal.App.3d at p. 330 (*People's Advocate*), quoting *In re Blaney* (1947) 30 Cal.2d 643, 655 [184 P.2d 892].) "To be functionally separable, the remainder after separation of the invalid part must be ' " 'complete in itself' " ' and 'capable of independent application.' (*People's Advocate, Inc. v. Superior Court, supra,* 181 Cal.App.3d at pp. 331–332.)" (*Abbott, supra,* 175 Cal.App.4th at p. 1358.)

The language in Measure H imposing a different and higher tax rate on nonresidential property over 2,000 square feet is easily excised, and its absence leaves a coherent, functioning tax measure. The measure currently levies the qualified special tax as follows: "(A) On each taxable, residential parcel at the rate of $120 per year, and (B) on each taxable, commercial or industrial property at the rate of $0.15 per square foot per year (but commercial or industrial property of 2,000 square feet or smaller paying $120 per year and commercial or industrial property larger than 2,000 square feet paying a maximum of $9,500 per year)." The District proposes, essentially, deleting the word "residential" and deleting subsection (B), so the levy reads: "On each taxable parcel at the rate of $120 per year."[35] This "grammatical" deletion (*People's Advocate, supra,* 181 Cal.App.3d at p. 330; cf. *Abbott, supra,* 175 Cal.App.4th at p. 1358) would leave a uniform tax of $120 per

---

[35] The District also proposes making a similar edit to the introductory paragraph of Measure H, so the phrase "levy a temporary 4-year emergency tax of $120 per residential parcel and 15¢ per square foot for commercial/industrial parcels . . ." reads "levy a temporary 4-year emergency tax of $120 per residential parcel."

parcel per year. Owners of residential property and nonresidential property of 2,000 square feet or less would be completely unaffected, while owners of larger nonresidential property, the class harmed by the unauthorized classification and differential tax rate, would see a tax reduction to the $120 annual rate paid by others.

■ That leaves the third component, volitional separateness. "To be volitionally separable, '[t]he final determination depends on whether "the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute" . . . or "constitutes a completely operative expression of the legislative intent." ' (*Santa Barbara [School] Dist. v. Superior Court* (1975) 13 Cal.3d 315, 331 [118 Cal.Rptr. 637, 530 P.2d 605].)" (*Abbott, supra*, 175 Cal.App.4th at p. 1358.) "[I]f a part to be severed [(and therefore saved)] reflects a 'substantial' portion of the electorate's purpose, that part can and should be severed and given operative effect." (*Gerken v. Fair Political Practices Com., supra*, 6 Cal.4th at p. 715; see *Santa Barbara School Dist. v. Superior Court, supra*, 13 Cal.3d at pp. 331–332 (*Santa Barbara School Dist.*) ["it seems eminently reasonable to suppose that those who favor[ed] the proposition would be happy to achieve at least some substantial portion of their purpose . . ."].)

According to the Board of Education resolution that put Measure H on the ballot, the board believed the measure was necessary to cope with serious budget shortfalls facing the District. The text of Measure H declares its purpose is "[t]o offset severe state budget cuts to Alameda schools, minimize school closures, and protect the quality of education, student safety, class sizes, excellent teachers and staff, and to restore prioritized cuts to music, athletics, advanced placement courses and other programs." Measure H further specifies it would raise the needed funds by levying a tax of at least $120 per parcel on every taxable parcel, more on larger commercial and industrial parcels.

Voters, at a minimum, chose to support local schools with a new tax of at least $120 per parcel. Although voters approved taxing larger nonresidential parcels at a higher rate, it "seems eminently reasonable to suppose that those who favor[ed] the proposition would be happy to achieve at least some substantial portion of their purpose" (*Santa Barbara School Dist., supra*, 13 Cal.3d at pp. 331–332) by imposing the $120 rate on these properties. Voiding the entire tax would wholly defeat voter expectations. We therefore conclude Measure H is "volitionally separable."[36]

---

[36] Because we can ascertain voters' preferences in this case, the outcome in *Abbott, supra*, 175 Cal.App.4th at pages 1358, 1361, is distinguishable. *Abbott* concluded a tax statute that

■ Severing the higher tax on nonresidential parcels not only has the benefit of best matching voters' intent, it also aligns with one of the long-established remedies for ·discriminatory taxes, equalizing the tax by assessing all tax payers at the preferred rate. For example, in *Haman v. County of Humboldt* (1973) 8 Cal.3d 922, 928 [106 Cal.Rptr. 617, 506 P.2d 993] (*Haman*), our Supreme Court explained "the court has the power to eliminate . . . discriminatory treatment . . . by granting those taxpayers, who have been assessed the higher rate, a refund based on the difference between the lower rate and the one under which they were assessed . . . ." (Italics omitted.) Looking at the history of the offending "boat tax" statute at issue, *Haman* took a path similar to the one we chart here, severing the statute so all subject boats were assessed at the lower 1 percent "in-state" rate, not the 24 percent "out-of-state" rate. (*Id.* at pp. 927–928; see *Macy's Dept. Stores, Inc. v. City and County of San Francisco* (2006) 143 Cal.App.4th 1444, 1450–1455 [50 Cal.Rptr.3d 79] [citing *Haman* and reversing award of full refund when city argued plaintiff was only entitled to refund of portion of tax that was discriminatory; plaintiff not entitled to windfall of no taxation].)

■ Having concluded that the unauthorized property classification and differential tax rate provisions of Measure H can be severed, we turn to the last issue raised by plaintiffs, the validity of the senior and disabled exemptions.

D. *The Exemptions for Senior and Disabled Homeowners*

Measure H provides exemptions for some senior and disabled taxpayers, specifically those who own and reside in single-family units. Plaintiffs contend these limited exemptions are at odds with section 50079 for two reasons. First, they discriminate among senior taxpayers and disabled taxpayers and thus do not apply uniformly to all senior and all disabled taxpayers. Second, they are predicated on property classifications and treat residential property differently from nonresidential property, and further distinguish between owner-occupied residential property and other residential property. The District maintains that because section 50079 permits, but does not require, exemptions for senior and disabled taxpayers, it can adopt any kind of exemption—complete or limited—for these taxpayers. It points out the "middle path" the District chose in Measure H is akin to the provision in

violated the commerce clause was susceptible to grammatical and functional separation, but not volitional separation, because the Legislature's intent was not discernible. (175 Cal.App.4th at pp. 1357–1358.)

article XIII, section 8.5, of the California Constitution allowing low- and moderate-income seniors and disabled homeowners to postpone payment of ad valorem property taxes. On this issue, we agree with the District, although for a different reason.

The language of the exemptions is silent as to their scope and, thus, does not indicate whether a school district can provide exemptions for some, but not all, senior and disabled taxpayers, based on the type of property the taxpayer owns. Plaintiffs' assertion that the parameters of the exemptions are fleshed out by the other provisions of the statute—which as we have discussed, do not authorize school districts to establish classifications and impose differential tax rates—has some logical appeal. In our view, however, the answer is provided by the legislative history of section 50079 and subsequent, like enabling statutes.

As we have discussed, the exemptions provided by these statutes were viewed as *exceptions* to the core definitional language that otherwise requires special taxes to "apply uniformly" to all taxpayers or all real property within a district. (E.g., Sen. Conc. Sen. Amends. to Assem. Bill No. 1440 (1987–1988 Reg. Sess.) as amended June 22, 1987, p. 1 ["Senate amendments makes [*sic*] an *exception to the uniformity requirement*, which allows special taxes which provide for an exemption for taxpayers age 65 or older." (italics added)]; Sen. Local Government Com., Rep. on Assem. Bill No. 3596 (1987–1988 Reg. Sess.) as amended June 29, 1988, p. 2 ["The committee may wish to consider whether special *taxes should be uniform or should permit local exemptions*." (italics added)].) Since the exemptions are "exceptions" to the uniformity requirement, they cannot, then, be defined by that requirement. We therefore conclude the limited exemptions provided by Measure H for senior and disabled homeowner residents do not exceed the statutory authority provided to school districts by section 50079.

## IV. DISPOSITION

The judgment in favor of the District is reversed in part and affirmed in part. The trial court is directed to enter judgment declaring the special tax imposed by Measure H invalid to the extent it imposes a tax other than $120 per parcel, unless the parcel is exempt from the special tax under the provisions of the measure, in which case, no tax may be imposed. The trial court shall also determine whether plaintiffs are entitled to any further

remedies, as sought in their trial brief. Each party to bear its own costs on appeal.

Dondero, J., concurred.

**MARCHIANO, P. J.,** Concurring.—I concur in the result and trumpet Justice Felix Frankfurter's imperative on the rules of statutory construction: " '. . . Read the statute; . . . read the statute; . . . read the statute!' "[1]

I have read and reread the statute in context as part of title 5, division 1, part 1, chapter 1 of the Government Code.[2] Government Code section 50079 is plain and clear on its face. Authorized by article XIII A, section 4, of the California Constitution, section 50079 enables school districts to impose qualified special taxes, defined as "special taxes that apply uniformly to all taxpayers or all real property within the school district," and exempt taxpayers 65 years of age or older and persons receiving Supplemental Security Income for a disability regardless of age. (*Id.*, subd. (b)(1).) The statute provides no more, no less.[3]

Within the statutory framework of article 3.8, section 50079 is immediately followed by section 50079.1 whereby the Legislature specifically authorized community college districts to impose differentiated nonuniform taxes for unimproved real property as opposed to other property: "special taxes shall be applied uniformly to all taxpayers or real property within the district, except that unimproved property may be taxed at a lower rate than improved property." By contrast with section 50079, a reader looking for guidance can see section 50079.1 provides more than section 50079 does, with a clearly expressed differentiation for improved and unimproved property.

Respondent does not seek a construction of section 50079, but an enlargement of it, so that what was omitted intentionally or inadvertently may be included within its scope. We do not have the power to ignore the common-sense reading of the words "apply uniformly to all taxpayers or all real property" to judicially supply a meaning that may seem wiser than what was

---

[1] Quoted by Justice Roberts in *In re England* (D.C. Cir. 2004) 363 U.S. App.D.C. 29 [375 F.3d 1169, 1182].

[2] All further statutory references refer to the Government Code unless otherwise indicated.

[3] Section 50079 became effective July 2, 1987, and later was amended, effective January 1, 2007. At all times the Legislature defined "qualified special taxes" to mean special taxes that apply uniformly to all taxpayers or all real property within the school district. The Legislature has not changed the limitation of uniform application.

omitted at the time of enactment. (§ 50079, subd. (b)(1).) We take the statute as we find it and assume the Legislature used common words with a common meaning as used in everyday speech, recognizing that "[w]e must not, however, be slaves to the tyranny of literalness so that we construe a statute in a way that yields 'a grotesque caricature of the Legislature's purpose' " or leads to an absurd result. (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1703 [8 Cal.Rptr.2d 614] (dis. opn. of Gilbert, J.).) There is nothing in the statute to suggest that we should deviate from the straight-forward and literal sense of the words "apply uniformly" to carve out subclasses or follow a special vernacular used in unrelated tax cases by tax specialists. To go beyond the plain meaning of the words to construe a statute in a way that may seem better policy to us is to usurp a power that our Constitution has entrusted to our elected Legislature. If the language of the statute is unambiguous, the Legislature is presumed to have meant what it said, and the plain meaning governs. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1000 [90 Cal.Rptr.2d 236, 987 P.2d 705].) Measure H has laudatory goals to provide critically needed additional school financing for the Alameda Unified School District; but we cannot rewrite an enabling statute, nor enlarge or contract it, where the words do not allow any other plain meaning.

The majority opinion discussion on legislative history, including later related legislation, is interesting, and arguably supportive of the result, but is unnecessary for contextual construction in this instance and is not controlling where the statute means what it says.[4] As Justice David Sills explained in *Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238 [8 Cal.Rptr.2d 298]: "it is the language of the statute itself that has success-fully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor. The same care and scrutiny does not befall the committee reports, caucus analyses, authors' statements, legislative counsel digests and other documents which make up a statute's 'legislative history.' "

---

[4] See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26 [34 Cal.Rptr.3d 520] for an indepth discussion of the proper consideration of legislative history evidence. Many items contained in a bill history file are not admissible as extrinsic evidence, such as proponents' statements about the bill's purpose without evidence they were communicated to the Legislature as a whole, individual legislators' expressions of their subjective intent, and memorandum from outside counsel for interested parties to proponents. (*Id.* at pp. 37–39.)

Measure H attempts to impose classification-based taxes which section 50079 does not begin to hint at authorizing. I would reverse because the language of the statute compels that result.

Respondent's petition for review by the Supreme Court was denied June 12, 2013, S209992.