Filed 8/3/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LELAND TRAIMAN,<br><br>　　　Plaintiff and Respondent,<br>v.<br><br>ALAMEDA UNIFIED SCHOOL DISTRICT,<br><br>　　　Defendant and Appellant. | A164935, A166022<br><br>(Alameda County<br>　Super. Ct. No.<br>　RG20061550) |

School districts may levy "qualified special taxes" pursuant to Government Code section 50079 (section 50079) with the approval of two-thirds of district voters. To constitute a qualified special tax, the tax must "apply uniformly to all taxpayers or all real property within the school district" (with some statutory exemptions) and not be "imposed on a particular class of property or taxpayers." Measure A, approved by voters in the Alameda Unified School District (District) in 2020, authorizes a tax on improved parcels at "the rate of $0.265 per building square foot not to exceed $7,999 per parcel." In this action brought by respondent Leland Traiman, the trial court ruled that the tax was not applied uniformly and invalidated the tax. The court thereafter awarded Traiman $374,960 in attorney fees pursuant to Code of Civil Procedure section 1021.5.

In these consolidated appeals, the District contends (1) the challenge to the tax rate was barred by judgments in prior validation actions (see Code Civ. Proc., § 860 et seq.); (2) the tax rate applies uniformly within the

1

meaning of section 50079; (3) to the extent any portion of Measure A is invalid, the remainder should be enforced; and (4) the award of attorney fees was improper.

We will reverse the judgment. The Measure A tax applies uniformly within the meaning of section 50079 because every nonexempt taxpayer and every improved parcel in the District is taxed using the same formula. Neither the language of the statute, case law, legislative history, nor public policy indicates that a school district cannot base a qualified special tax on building square footage with a maximum tax per parcel. Because the judgment must be reversed on this ground, we need not and do not decide the other issues raised by the District.

## I. FACTS AND PROCEDURAL HISTORY

### A. Prior School District Funding Measures

Before the adoption of Measure A in 2020, District voters have approved tax measures to provide funds for Alameda schools since at least 2008. Three of these measures are germane to the issues raised here: Measure H in 2008, Measure A in 2011, and Measure B1 in 2016.

In June 2008, District voters adopted Measure H, by which non-exempt residential parcels were taxed at $120 per year, commercial and industrial parcels less than 2,000 square feet were also taxed at $120 per year, but commercial and industrial parcels greater than 2,000 square feet were taxed at $0.15 per square foot, up to a maximum tax of $9,500 per year. George J. Borikas, trustee of the George J. Borikas 1999 Revocable Trust, filed a lawsuit seeking to have the tax declared invalid. The trial court ruled in the District's favor on the ground that classifications are permissible if rational and all taxpayers within the classification are treated equally. Borikas appealed.

In 2011, while the appeal regarding Measure H was pending, District voters approved a separate measure (Measure A (2011)) to provide financial support for local school programs. The measure took an approach different than Measure H, authorizing a $299 tax on unimproved parcels, and—on *all* improved parcels—a single tax formula of $0.32 per square foot of improvement with a $7,999 maximum tax amount regardless of use.

Measure A (2011) was challenged in a "reverse validation action" (see Code Civ. Proc., § 863) in *Nelco, Inc. v. Alameda Unified School District* (Sept. 20, 2011, Alameda County Superior Court Case No. RG11-574574) (*Nelco I*). The plaintiffs argued "there is a lack of uniformity . . . because parcels with buildings with a square footage of 24,997 or less pay $0.32 per square foot, whereas parcels with buildings with 24,998 square feet or more pay a flat rate of $7,999 regardless of the actual building size." The superior court ruled that plaintiffs were incorrect and had failed to show "that the special tax imposed by Measure A violates the uniformity requirement of Government Code section 50079." Judgment was entered, and no appeal was taken.

In 2013, the court of appeal issued its decision regarding Measure H in *Borikas v. Alameda Unified School District* (2013) 214 Cal.App.4th 135 (*Borikas*). As we explain at length *post*, *Borikas* held that "Measure H's imposition of a higher tax on commercial or industrial property over 2,000 square feet exceed[ed] the District's taxing authority under section 50079" because school districts cannot create classifications of taxpayers or property and tax them differently. (*Id.* at p. 165.) The court of appeal severed that language from Measure H, leaving a tax of $120 for all non-exempt parcels. (*Id.* at pp. 168–169.)

With Measure A (2011) set to expire in 2018, District voters approved Measure B1 in 2016. Measure B1 extended the funding provided by Measure A (2011) with the same per square foot and maximum amount of tax. It too was subject to a reverse validation action, *Nelco, Inc. v. Alameda Unified School District* (Oct. 26, 2017, Alameda County Superior Court Case No. RG16841074) (*Nelco II*). The court indicated in writing its intention to rule that the uniformity issue was addressed in the earlier *Nelco I* ruling, which "precludes the current challenge." The parties entered a stipulated judgment that referenced *Nelco I* and Measure A (2011), stating that "[t]he tax authorized by Measure B1 is valid as a renewal of the previously validated Measure A."

## B. Measure A (2020)

The District's Board of Education placed a new measure on the March 2020 ballot—"Measure A," hereafter Measure A (2020)—to obtain voter approval of a qualified special tax that would fund increased salaries for District teachers and staff. This is the measure that is the subject of this appeal.

Following a formula similar to that approved in *Nelco I*, and distinguishable from what was disapproved in *Borikas*, Measure A (2020) stated: "Upon approval of two-thirds of those voting on this Measure, the District shall be authorized to levy an annual qualified special tax (education parcel tax) on all Parcels of Taxable Real Property, commencing on July 1, 2020 for a period of 7 years. The tax shall be levied on improved parcels at the rate of $0.265 per building square foot not to exceed $7,999 per parcel and

4

at the rate of $299 per vacant parcel."[1]  District voters approved Measure A (2020) on March 3, 2020.

C.  Traiman's Reverse Validation Lawsuit

Traiman filed a Complaint for Invalidation in May 2020 (Code Civ. Proc., § 863), contending Measure A (2020) was invalid due to the section 50079 requirement that qualified special taxes "apply uniformly to all taxpayers or all real property within the school district."  Although Measure A (2020) applied a single specified tax rate and cap to all nonexempt taxpayers and parcels, Traiman alleged that the cap created an impermissible classification.  In particular, Traiman alleged the $7,999 tax cap on " 'improved parcels' creates a classification that [] section 50079 did not permit" because "there are " 'improved parcels' " with one or more " 'building(s)' " over 30,184.91 building square feet[,]" and "[f]or each one of these 'improved parcels,' the effective tax rate is less than $0.265 per building square foot."  In his words, "[t]he larger the building, the lower the effective tax rate."[2]

The trial court held a bench trial on September 14, 2021.  After issuing a proposed statement of decision in November 2021, the court issued its Judgment and Statement of Decision in April 2022.  Based on *Borikas*, the court ruled:  "Under the law, there simply cannot be any different

---

[1]     Measure A (2020) contained a severability clause that stated, in part: "Upon approval of this Measure by the voters, should any part of the Measure or tax rate be found by a court of competent jurisdiction to be invalid for any reason, all remaining parts of the Measure and/or tax rate shall remain in full force and effect to the fullest extent allowed by law."

[2]     Traiman also challenged Measure A (2020) as to certain exemptions for senior citizens and others.  The trial court dismissed this challenge on the District's motion for judgment on the pleadings; that ruling is not at issue in this appeal.

classifications, distinctions, definitions, or square footage limitations in levying the tax on improved property.  [¶ . . . ¶]  The $7,999 cap in Measure A (2020) creates a classification between improved properties based on size and applies a different and preferentially lower tax rate to properties above 30,184.91 square feet which is prohibited.  The court concludes that Measure A (2020)'s imposition of a higher tax rate on improved properties *under* 30,184.91 square feet than that imposed on improved properties with 30,184.91 square feet *or more* exceeds defendant's taxing authority under section 50079 and as such is invalid."  The court declared Measure A (2020) "invalid in its entirety except for the $299 flat tax on unimproved property."  The District timely appealed from the judgment (appeal number A164935).

The trial court thereafter awarded Traiman $374,960 in attorney fees as the successful party under Code of Civil Procedure section 1021.5.  The District timely appealed this order as well (appeal number A166022).  We consolidated appeal numbers A164935 and A166022.

## II.  DISCUSSION

The trial court ruled that the application of the Measure A (2020) tax to improved parcels at "the rate of $0.265 per building per square foot not to exceed $7,999 per parcel" violates the requirement in section 50079 that qualified special taxes "apply uniformly."  The District contends the court erred, because the same tax formula is imposed on every nonexempt taxpayer and as to every improved property in the District.

To decide the issue, we construe the "apply uniformly" requirement using well-established canons of statutory construction.  We first examine the words of the statute because the statutory language is generally the most reliable indicator of the Legislature's intent.  Unless indicated otherwise, we give the words their ordinary and usual meaning and construe them within

6

their statutory context.  Where the plain, commonsense meaning of the statutory language is unambiguous, the plain meaning controls.  (*Catlin v. Superior Court* (2011) 51 Cal.4th 300, 304.)  Where the statutory language is ambiguous, we may consider other indicia of legislative intent, including " 'the ostensible objects to be achieved, the evils to be remedied, the legislative history, [and] public policy . . . .' "  (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1153.)

Applying these canons, we find that that the Measure A (2020) tax is applied "uniformly" as understood in section 50079.  We therefore reverse the judgment, including the award of attorney fees.

A.  Section 50079

Currently (and at the time Measure A (2020) was enacted and the trial court ruled), the statute reads:  "Subject to Section 4 of Article XIII A of the California Constitution, any school district may impose *qualified special taxes* within the district pursuant to the procedures established in Article 3.5 (commencing with Section 50075) and any other applicable procedures provided by law."  (§ 50079, subd. (a), italics added.)

" '[Q]ualified special taxes' " are defined in subdivision (b)(1) of section 50079 as "special taxes that *apply uniformly* to all taxpayers or all real property within the school district, except that unimproved property may be taxed at a lower rate than improved property" and certain enumerated persons may be exempted.  (Italics added.)[3]  Subdivision (b)(2) of the statute adds that " '[q]ualified special taxes' do not include special taxes imposed on a

---

[3]     Subdivision (b)(1) of section 50079 provides that qualified special taxes "may include taxes that provide for an exemption from those taxes" for persons who are 65 years old or older, receive Supplemental Security Income for a disability, or receive Social Security Disability Insurance benefits with income under a specified amount.

7

*particular class* of property or taxpayers." (Italics added.) Taking these two subdivisions together, a qualified special tax is one that "appl[ies] uniformly" to all taxpayers or real property (with statutory exceptions), without taxing only a specific class of property or taxpayer.

B. <u>Measure A (2020) and the Plain Meaning of the Statute</u>

The common meaning of the word "apply," as relevant here both now and when section 50079 was enacted, is to put to use or to have a practical bearing upon something. (See Oxford English Dict. (3d ed. 2008, published online March 2023; see also Merriam-Webster.com Dictionary [defining "application" as, among other things, putting something to use]; Black's Law Dictionary (11th ed. 2019) p. 124 ["apply" means "to put to use with a particular subject matter"].) The common meaning of "uniformly" is "[i]n a manner that is always the same; without variation or alteration; at all times or in every case alike; invariably." (Oxford English Dict. (3d ed. 2008, most recently modified version published online July 2023; see *Borikas, supra*, 214 Cal.App.4th at p. 147 [quoting Oxford English Dict. (2d ed.) 1989, p. 59: "[o]f one form, character or kind; having, maintaining, occurring in or under, the same form always; that is or remains the same in different places, at different times, or under varying circumstances, exhibiting no difference, diversity, or variation"].) Therefore, to apply uniformly in the context of a District imposing a qualified special tax, the tax must be put to use as to all (nonexempt) taxpayers or properties in the District without variation.

Given the plain meaning of the statutory language, the tax imposed by Measure A (2020) "appl[ies] uniformly" to all taxpayers or property. (§ 50079, subd. (b)(1).) The same tax rate—$0.265 per building per square foot not to exceed $7,999 per parcel—is imposed on every improved parcel in the district. That same rate is imposed on every non-exempt taxpayer. The tax is not just

8

"imposed on a particular class of property or taxpayers." (§ 50079, subd. (b)(2).)[4]  Accordingly, the Measure A (2020) tax is a qualified special tax for purposes of section 50079.

C. Traiman's Argument

Even though Measure A (2020) applies the same tax formula to every improved parcel in the District, Traiman argues (and the trial court concluded) that the *cap* on the payable tax means the District has, in effect, created two classifications of properties that are taxed differently.  No cited case has embraced this theory.

Out of the Measure A (2020) language that the "tax shall be levied on improved parcels at the rate of $0.265 per building square foot not to exceed $7,999 per parcel," Traiman hones in on the $7,999 cap and calculates that, at a rate of $0.265 per square foot, properties with a square footage of approximately 30,184.91 will incur $7,999 in tax.  He then divides properties into two groups:  those that have a square footage of not more than 30,184.91 and those that have a square footage over 30,184.91.  Taxpayers of properties of not more than 30,184.91 square feet will pay $0.265 per square foot; taxpayers of properties over 30,184.91 square feet will pay the $7,999 cap, so they will end up paying less than $0.265 per square foot.  Based on this deconstruction, Traiman argues that the cap creates a facial classification prohibited by section 50079 because it yields different effective tax rates for different properties.

Traiman's argument misperceives section 50079.  The statutory language requires that the same tax be *imposed* on all taxpayers or

---

[4]     Measure A (2020) contains a separate rate of tax ($299) for *unimproved* parcels, but that is permitted under a 2018 amendment to section 50079. (Stats. 2018, ch. 305.)

9

properties in the district and not target a particular class of property or taxpayer; the statute does not further require that the application of the tax *result* in an identical effective tax rate for every taxpayer and every property. As we explain next, neither case law, legislative history, nor public policy supports the conclusion that a school district is powerless to impose a special tax merely because it caps the taxpayers' liability.

1.  Case Law:  *Borikas* and *Dondlinger*

Traiman contends, and the trial court ruled, that the tax imposed by Measure A (2020) is invalid under *Borikas, supra*, 214 Cal.App.4th 139. *Borikas,* however, did not involve the tax structure established by Measure A (2020).

At issue in *Borikas* was whether section 50079 was violated by Measure H, by which the District had set up distinct categories of property and then applied different tax formulas to the categories:  (1) residential parcels were taxed at $120 per year; (2) commercial and industrial parcels less than 2,000 square feet were taxed at $120 per year; but (3) commercial and industrial parcels greater than 2,000 square feet were taxed differently, using a formula of $0.15 per square foot up to a maximum of $9,500 per year. (*Borikas, supra*, 214 Cal.App.4th at pp. 139–140.)

The threshold question in *Borikas* was whether the phrase "apply uniformly" in section 50079 reflected any limitation on a school district's authority to tax property, beyond the limitations that existed before the statute's enactment.  The District argued that Measure H was fine as-is, because uniformity in tax law had a well-established meaning that allowed rational classifications under equal protection principles and only required that all taxpayers or property *within* a classification be treated the same. (*Borikas, supra*, 214 Cal.App.4th at pp. 148–151.)  The plaintiffs, on the other

10

hand, urged that school districts could no longer classify taxpayers or property and tax them differently as in Measure H. (*Id*. at pp. 146–148.)[5]

In answering this threshold question, *Borikas* made three essential observations. First, if the Legislature had intended to grant school districts the broadest taxing authority, bounded only by equal protection principles as the District argued, there would have been no need to include the uniform application language in section 50079, subdivision (b). (*Borikas, supra*, 214 Cal.App.4th at p. 151.) In particular, subdivision (b) explicitly exempts seniors and certain other taxpayers from the statute's uniform application rule, which would not have been necessary if the "apply uniformly" language still left school districts free to apply different tax rates to different taxpayers. (*Id*. at pp. 151–152.) Second, statutes enacted to authorize other local agencies to impose taxes, using the same or similar uniformity language as section 50079, indicated that such language did not allow agencies to tax classes of taxpayer or property differentially. (*Id*. at pp. 152 [e.g., § 50079.1, containing an exception to uniformity that allowed unimproved property to be taxed at a lower rate than improved property], 158–164.) Third, the legislative history of section 50079 showed that the "apply uniformly" language had prompted school districts to seek and obtain an exemption for senior taxpayers, and to express concern about the ability to tax residential and nonresidential properties differently, reflecting the districts' view of the legislation. (*Id*. at pp. 153–158.)

Based on these observations, *Borikas* concluded that subdivision (b) of section 50079 was not mere surplusage, as the District had argued, but posed

---

[5] The plaintiffs in *Borikas* also challenged Measure H's exemptions for senior and disabled taxpayers; the court of appeal decided those exemptions were permissible. (*Borikas, supra*, 214 Cal.App.4th at p. 140.)

11

a new limitation on the taxing authority of school districts, precluding them from imposing special taxes "that classify and differentially tax property within the district." (*Borikas, supra*, 214 Cal.App.4th at p. 164; see *id.* at p. 151 ["the definitional language at issue is language of limitation and does not empower school districts to classify taxpayers and property, and impose different tax rates"].) Accordingly, the court of appeal held that the District's use of different tax rates for its different classifications of properties was improper: "Measure H's imposition of a higher tax on commercial or industrial property over 2,000 square feet exceeds the District's taxing authority under section 50079." (*Id.* at p. 165.) The court severed this aspect of Measure H, leaving a tax of $120 to be imposed on non-exempt taxpayers as to each parcel. (*Id.* at pp. 166–168.)

*Borikas*, however, did not address the situation presented in this appeal. It decided only that the District lacked authority under section 50079 to impose one tax formula (a flat rate) for commercial or industrial property under 2,000 square feet, and impose a different tax formula (based on square footage and a cap) for commercial or industrial property over 2,000 square feet. It did not hold that the latter tax formula was invalid because it was based on square footage and a cap (as here), but because it was assigned to one explicit class of properties while a *different* formula was imposed on another explicit class of properties. *Borikas* did not indicate that the cap on maximum tax liability in Measure H was a "classification" of taxpayers or of real property, let alone one that would violate section 50079. [6]

---

[6] In his respondent's brief, Traiman now argues that *Borikas* construed section 50079 to prohibit a tax cap because *Borikas* used plurals when stating, "we therefore conclude Measure H's property *classifications* and differential tax *burdens* exceed the District's taxing authority," and it eliminated all classifications in preserving only a $120 flat tax for all

12

Put differently, Measure A (2020) avoids the impropriety adjudicated in *Borikas* by omitting the flat tax for a class of properties and by leaving only a *single* tax formula—based on square footage with a cap—for all properties and taxpayers.

Unlike *Borikas*, the question here is whether the single tax formula of Measure A (2020) is not uniformly applied even though every nonexempt taxpayer and parcel is subject to it. The tax formula has two aspects: (1) it is based on the property's square footage, with different properties incurring different tax liability (rather than a flat rate yielding an identical tax bill for every property); and (2) it has a cap, such that some taxpayers will *end up* paying per square foot while others pay $7,999, resulting in properties of different sizes yielding different effective tax rates per square foot. As shown next, case law suggests the square footage tax is permissible, and the cap does not render it impermissible.

Instructive to some extent is *Dondlinger v. Los Angeles County Regional Park & Open Space Dist.* (2019) 31 Cal.App.5th 994 (*Dondlinger*), which approved a square footage tax and suggests that what taxpayers *end up* paying is not relevant to whether a tax is uniformly *applied*. There, the court considered Public Resources Code section 5566, which provides that "a district may establish a zone or zones and a rate of tax for each zone, which is to be *applied uniformly* to all taxpayers within the zone." (Italics added.) Voters had approved "a tax 'on all improved parcels in the District at a rate of 1.5 cents per square foot of structural improvements, excluding the square

property types. (See *Borikas, supra*, 214 Cal.App.4th at p. 140, italics added.) Traiman is mistaken. The plurals are because *Borikas* concerned two express classifications of property, with different tax burdens on those classifications. Even though Measure H contained a cap, *Borikas* never indicated it had any significance to the uniform application requirement of section 50079.

13

footage of improvements used for parking.' " (*Dondlinger*, *supra*, 31 Cal.App.5th at p. 996.)  The plaintiff argued that the tax did not apply uniformly because, among other things, "each different property has a different square footage of structural improvements."  (*Id.* at p. 998.)

Acknowledging that *Borikas* had found section 50079 "to limit the tax-levying authority . . . beyond the constitutional equal protection limits that would have applied even absent such language," *Dondlinger* upheld the square footage-based tax even though it yielded a different tax bill depending on the size of the property and whether the property contained improvements used for parking.  (*Dondlinger*, *supra*, 31 Cal.App.5th at p. 1000.)  The court explained:  "We do not read the statute to require a uniform *effect or outcome, but rather uniform application.  We disagree with Dondlinger's most basic premise that the tax is not uniformly applied because arithmetic functions render outcomes different for different taxpayers based on property size, type, or use*, regardless of how taxpayer is defined.  *Each taxpayer is required to pay the same 1.5 cents per square foot of structural improvements on their real property not used for parking*.  One is only a 'taxpayer' for purposes of the Measure A special tax if they own real property that contains structural improvements not used for parking.  Classes of property are not treated differently; a residential garage is not treated differently from a commercial parking garage, and a house is not treated differently from an apartment building or a shopping mall."  (*Id.* at p. 1001, some italics added.)  In short, the requirement that a tax "apply uniformly" does not mean that every taxpayer must receive a uniform outcome.

As applied here, *Dondlinger* indicates that a tax based on square footage does not violate the uniform application rule of section 50079, just as

14

a square footage tax does not violate the uniform application rule in Public Resources Code section 5566.  Indeed, Traiman does not argue otherwise.

Furthermore, although *Dondlinger* did not involve a cap, its view that a tax may be applied uniformly even if "arithmetic functions render outcomes different for different taxpayers based on property size" goes against the grain of Traiman's argument that the cap in Measure A (2020) is impermissible because it yields different effective tax rates for larger properties.  (*Dondlinger, supra*, 31 Cal.App.5th at p. 1001.)  Both Traiman's complaint and the trial court's ruling were premised on the idea that all taxpayers must pay the same effective tax rate per square foot.  As the trial court put it:  "The $7,999 cap in Measure A (2020) creates a classification between improved properties based on size and applies a different and preferentially lower tax rate to properties above 30,184.91 square feet which is prohibited."  The inference from *Dondlinger* is that different outcomes for taxpayers, such as their effective tax rates, due to the application of a tax formula does not mean the tax formula fails the uniform application test.

Moreover, while *Borikas* did not decide the issue, its resolution of the case shuttered any notion that section 50079 requires that every taxpayer end up paying the same amount per square foot.  In adjusting Measure H so it imposed just a flat rate tax, the court found it would leave a "coherent, functioning tax measure" and that its modification "aligns with one of the long-established remedies for discriminatory taxes, *equalizing the tax by assessing all taxpayers at the preferred rate*."  (*Borikas, supra*, 214 Cal.App.4th at pp. 166–168, italics added.)  By applying the flat tax to every property, the effective tax rate per square foot would vary depending on the parcel's size:  $120 for a 1,000 square foot parcel would yield a different effective tax rate per square foot than $120 for a 30,000 square foot parcel.

Plainly, *Borikas* saw no need for every taxpayer to pay the identical effective rate per square foot.  (*Id*. at p. 168.)

In sum, while there is no cited case directly on point, the cases relied upon by the parties do not dissuade us from our reading of the plain language of section 50079.  If anything, *Dondlinger* and *Borikas* suggest that, contrary to Traiman's position, a tax formula that is imposed on all taxpayers or property types is applied uniformly, even if it results in a different effective tax bill or tax rate due to the size of the property.  The cap in Measure A (2020) does not transform its permissible square footage tax into something impermissible on the theory Traiman asserts.

### 2. Legislative History

To the extent the phrase "apply uniformly" in section 50079 is ambiguous, the legislative history confirms that Traiman's idea of extending *Borikas* to bar a cap on property taxes goes beyond what the Legislature had in mind.

Section 50079 originated in Assembly Bill No. 1440 (AB 1440) in 1987.  AB 1440 was introduced by Assemblyman Tom Hannigan, not to limit existing district authority to impose taxes, but to make sure school districts *had* taxing authority despite the 1986 passage of Proposition 62.  Proposition 62, which (among other things) required two-thirds voter approval of local special taxes, created a concern that its language had inadvertently deleted school district authority to impose special taxes under Government Code section 50075, which "provide[s] all cities, counties, and districts with the authority to impose special taxes, pursuant to the provisions of Article XIII A

16

of the California Constitution" without any further requirement as to uniformity.[7]  (See *Borikas, supra,* 214 Cal.App.4th at p. 144.)

Indeed, the overwhelming sentiment in the legislative history is the need to restore school district taxing authority.  The preliminary analysis of the Assembly Committee on Revenue and Taxation explained:  "Because of the passage of Prop. 62 in 1986, there is some question that school districts can impose special taxes.  This bill clarifies current law to permit schools to impose such taxes with a two-thirds vote of the people."  The Senate Rules Committee stated that the legislation would "clarify that school districts have the authority to impose special taxes, subject to two-thirds voter approval, thereby restoring any taxing authority deleted by Proposition 62."

AB 1440 was amended in the Assembly to add the definition of qualified special taxes now found in section 50079, subdivision (b), including that such taxes "apply uniformly to all taxpayers or all real property within the school district."  (*Borikas, supra,* 214 Cal.App.4th at pp. 153–154 [the "Bader amendment"].)  The precise motive for this amendment, however, remains a mystery.  Neither party in this appeal directs us to any legislative document setting forth what the language was intended to accomplish.  In his statement on the Assembly floor urging passage of the bill, Hannigan explained the legislation had been amended " 'in the Revenue and Taxation Committee to make it clear that this special tax must apply uniformly to all

---

[7]     As stated by the Senate Rules Committee:  "Because the school's sole authority to impose special taxes stems from Government Code section 50077 [sic], Proposition 62 has been widely interpreted to eliminate district['s] special taxing authority.  The California Taxpayers Association, which sponsored Proposition 62, indicates that it did not intend the proposition to have this effect."

17

*taxpayers* in the district.' " (*Borikas, supra,* 214 Cal.App.4th at p. 154, italics added.)

As *Borikas* points out, some school districts responded to the Bader amendment by urging further amendments stating that districts could exempt taxpayers over 65 years old from the tax, and to allow a district to impose different tax rates on residential and nonresidential property. (*Borikas, supra,* 214 Cal.App.4th at pp. 154–156.) As passed by the Assembly, the bill permitted school districts to impose special taxes if they were uniform and did not discriminate against a class of property or taxpayers; the Senate amendments made an exception to allow an exemption for taxpayers 65 years or older. The Assembly approved the bill as amended, and the legislation was signed into law by the Governor in July 1987. (*Id.* at pp. 156–157.)

While this may suggest that some school districts and legislators viewed the "apply uniformly" language, without an amendment, to preclude districts from exempting seniors or treating residential and commercial property differently, we must be careful not to extrapolate too much from too little. In the first place, how the *districts* viewed the legislation does not equate to legislative intent, and the fact that legislators agreed to a senior exemption hardly suggests they were adamant that all taxpayers' property be taxed the same or at the same effective rate. Indeed, for some districts or legislators, the language exempting seniors could have been motivated by a desire to avoid uncertainty and litigation by making clear that districts would have continued authority to exempt seniors, rather than a confession that the "apply uniformly" language erased such authority.

Moreover, in this case, what the legislative history does *not* say is as important as what it does say. Accepting that the Legislature saw the "apply

uniformly" language to require uniform application to all *taxpayers* and all *types* of property (commercial and residential, improved and unimproved), there is nothing to suggest that anyone thought a tax rate could not take account of the *size* of the property. (See *Borikas, supra*, 214 Cal.App.4th at p. 158 [noting districts did not seek exemption for differential tax treatment of parcels by size].) Nothing in the legislative history states that every taxpayer must end up paying the same tax, or that every taxpayer must enjoy the same effective tax rate as Traiman urges here. To the contrary, legislators were well aware that school districts imposed parcel taxes at a flat rate, resulting in different effective tax rates. (*Ibid.*) Furthermore, nothing in the legislative history of section 50079 states that a school district cannot cap taxpayers' liabilities. And nothing in the legislative history supports the conclusion of the trial court here that "[u]nder the law, there simply cannot be any different classifications, distinctions, definitions, or square footage limitations in levying the tax on improved property." The language in *Borikas* that districts cannot "classify and differentially tax property within the district" (*id*. at p. 164) should not be expanded beyond the legislative history on which it is based.

In our view, the takeaway from the legislative history of section 50079 is that lawmakers and school districts urgently wanted the districts to have the power to impose special taxes with voter approval, notwithstanding the advent of Proposition 62, and for districts to have the right to exempt seniors despite the requirement that the tax apply uniformly to all taxpayers or real property and not discriminate against a class of taxpayer or property. By no

means was a district's use of a cap on tax liability the "evil" the legislators sought to address.[8]

### 3. Public Policy

The point of section 50079 and *Borikas* is that school districts cannot create classifications of taxpayers or types of real property like they used to do (except as expressly permitted by the statute), and then assign different taxes or tax rates to those classifications. But that is not what Measure A (2020) does. It does not, for example, target a particular class of taxpayer or distinguish commercial properties from residential properties.

Indeed, Measure A (2020) does not categorize property at all. It does not, by its express terms, set up two classifications— one of parcels under 30,184.91 square feet of improvements and another of parcels over 30,184.91 square feet of improvements—and then tax them differently. Instead, it imposes a square footage tax at the rate of $0.265 per building square foot on *all* parcels; it then essentially promises voters it will not collect more than

---

[8] Traiman argues that the Legislature implicitly affirmed *Borikas* by declining to pass legislation that would have overruled it. In the 2013–2014 legislative session, Assembly Bill 59 would have allowed school districts to impose parcel taxes with classifications of taxpayers and property, abrogating *Borikas*, but "AB 59 died in the Assembly." Around the same time, Senate Bill 1021 sought to abrogate *Borikas* by allowing school districts to classify certain types of property (residential, multifamily residential, industrial, or commercial) and tax each classification differently, as long as all properties within the classification remained the same. The bill never made it out of committee. Traiman argues that, by rejecting AB 59 and SB 1021, the Legislature implicitly affirmed *Borikas's* central holding. However, neither legislation pertained to the use of a cap. Moreover, dead bills tell no tales: unsuccessful legislation generally has little relevance in interpreting a statute. (*People v. Mendoza* (2000) 23 Cal.4th 896, 921; *Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 746.)

$7,999 on any one parcel, no matter who owns it, and no matter what the property's type or use.

The difference between (1) explicitly classifying properties and taxing them separately, and (2) having a tax formula that ends up taxing properties at different rates, is significant. The first *applies* a non-uniform tax, which the statute prohibits; the latter yields a non-uniform effective rate, which the cases have embraced.

Furthermore, Traiman's effort to deconstruct the Measure A (2020) tax formula to make it look like it classifies properties based on size is unpersuasive for another reason: any tax can be made to appear to create classifications and tax them differently. The square footage tax approved in *Dondlinger*, for example, was presented as "1.5 cents per square foot of structural improvements," excluding improvements used for parking. But it could be viewed as creating classifications for each size of parcel: a tax of 1.5 cents on parcels with 1 foot of structural improvement, 3 cents on parcels with 2 feet of structural improvement, 4.5 cents on parcels with 3 feet of structural improvement, and so on. It could also be viewed as creating classifications based on whether a property contained a structural improvement for parking. The flat tax embraced in *Borikas* was $120 per parcel. But it could be viewed as creating classifications for each size of parcel: a tax of 0.120 cents per square foot for parcels of 1,000 square feet, a tax of 0.040 cents per square foot for parcels of 3,000 square feet, and the like. Without flat taxes, square footage taxes, taxes with caps, regressive taxes, or progressive taxes, it is unclear how a school district could impose taxes for its schools at all, even though the very purpose of section 50079 was to empower districts to do so.

21

It also must be remembered that voters approved Measure A (2020) by a super-majority two-thirds vote to support their schools, teachers, and staff, with the understanding that no one, no matter how big their buildings or how they put those buildings to use, would have to pay more than $7,999 in tax. Since the Legislature and the courts have both recognized that differences in the effective tax rate may be tolerated, we fail to see how Measure A (2020) unlawfully discriminates against anyone. Moreover, there is no indication that this is anything the Legislature did not want school districts to do.

In fact, a strong clue to the meaning of "apply uniformly" in section 50079, subdivision (b)(1), lies in the statute's subdivision (b)(2), which reads: " 'Qualified special taxes' do not include special taxes imposed on a particular class of property or taxpayers." It is clear from subdivision (b)(2) that the Legislature was concerned about explicit categories that Districts might set up in a tax measure, including wholesale exemptions of specific types of taxpayers or properties. There would be no reason to include subdivision (b)(2), however, if the uniform application principle in subdivision (b)(1) prohibited all classification of taxpayers or real property, facial or de facto, as Traiman and the trial court concluded. To the contrary, the inclusion of subdivision (b)(2) reflects a legislative understanding that the uniform application required by subdivision (b)(1)—imposing the same tax formula on all—might inevitably result in some disparities in tax rate among de facto classifications (e.g., due to property size, as here), but only the use of explicit facial classifications would fall outside the authority granted to districts by the statute. For this reason, the explicit categories created by Measure H were properly stricken in *Borikas*, but there is no basis for striking the uniformly applied tax formula here.

We therefore hold that, under the circumstances of this case, a cap on maximum tax liability does not create classifications and differential taxation that violate section 50079, subdivision (b). It does not transform a permissible square footage tax into a tax that is not uniformly applied for purposes of the statute. In light of the statute's plain language and consistent with case law, legislative history, and public policy, the tax imposed by Measure A (2020) is a qualified special tax, which applies uniformly to all taxpayers or real property and does not discriminate against a class of taxpayer or property. Accordingly, the trial court erred in ruling Measure A (2020) invalid.[9]

## III. DISPOSITION

The judgment is reversed.

---

[9]  In September 2022, the District filed a motion asking this court to take judicial notice of the records of the legislative history of AB 1440. We deferred ruling on the motion until our consideration of the merits of the appeal. In October 2022, Traiman filed a motion seeking judicial notice of material including bills not enacted by the Legislature, records related to amendments to section 50079, and election results regarding school district parcel taxes. The District opposed the motion, and we deferred our ruling pending our consideration of the merits. We hereby grant both motions.

_____

Chou, J.

We concur:

_____

Jackson, P.J.

_____

Burns, J.

A164935, A166022 / Traiman v. Alameda Unified School District

24

Trial Court:  Superior Court of Alameda County

Trial Judge:       Julia Spain

Counsel:     Dannis Woliver Kelley; Sue Ann Salmon Evans, Luke L. Punnakanta, and William Benjamin Tunick, for Defendant and Appellant.

Lozano Smith; Sloan R. Simmons, Daniel Michael Maruccia, Constantine C. Baranoff, California School Boards Association Education Legal Alliance; Keith Jonathan Bray, Kristin Dianne Lindgren, and Dana Lee Sever Scott, Counsel for amicus curiae on behalf of Defendant and Appellant.

Brillant Law Firm; David Joseph Brillant and Cameren Neill Ripoli, for Plaintiff and Respondent.